UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARILYN MORTON, et al.,<br><br>    Plaintiffs,<br><br>v.<br><br>COUNTY OF SAN DIEGO, et al.,<br><br>    Defendants. | Case No.: 21-cv-1428-MMA-DDL<br><br>**AMENDED ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION TO COMPEL PRODUCTION OF DOCUMENTS**<br><br>**[Dkt. No. 56]** |

## I.

## INTRODUCTION

Joseph Morton committed suicide while incarcerated at the Vista Detention Facility. Following Morton's death, the San Diego Sheriff's Department's Critical Incident Review Board ("CIRB") conducted a review as required by Sheriff's Department policy and generated a CIRB Report. In this civil rights action arising from Morton's death, Plaintiffs Marilyn and Dean Morton move to compel production of (1) the CIRB Report and related documents, (2) documents from the Citizens Law Enforcement Review Board ("CLERB") pertaining to Morton's death, and (3) emails between employees of Defendant Liberty Healthcare, which provided mental health services to individuals detained at the Vista Detention Facility.

The County of San Diego ("County") argues that the CIRB Report and related documents are protected by the attorney-client privilege and the work-product doctrine and that the attorney-client privilege and the official information privilege protect the CLERB documents from disclosure. Liberty Healthcare asserts the work-product doctrine as a basis to withhold production of its employees' emails.

The Court concludes that: (1) the County has not established that the attorney-client privilege or work product doctrine applies to the documents generated in the CIRB review in their entirety, including the CIRB Report, and that the County must produce these documents with redactions to specific portions of the CIRB Report; (2) the County has not established that the attorney-client privilege or the official information privilege applies to the CLERB documents; and (3) the work product doctrine does not apply to the Liberty Healthcare emails. As such, the Court GRANTS IN PART and DENIES IN PART the motion.

## II.
## FACTUAL BACKGROUND

### A. Morton's Suicide

Plaintiffs' Third Amended Complaint alleges that Morton was arrested for an attempted robbery on May 11, 2020. Dkt. No. 28 at ¶ 5. He made suicidal statements to the arresting deputies and expressed suicidal thoughts to County intake staff at the Vista Detention Facility ("VDF"). *Id.* at ¶¶ 6-7. A Liberty Healthcare psychologist performed a suicide assessment and deemed Morton to be a "low" risk for suicide. *Id.* at ¶ 9. Morton was placed in Enhanced Observation Housing. *Id.*

On May 12, 2020, a Liberty Healthcare mental health clinician performed a follow-up suicide assessment. *Id.* at ¶ 10. The clinician determined that Morton was a low risk for suicide and cleared him for mainline housing, which meant he would be placed in an isolation cell for ten days. *Id.* at ¶¶ 11-12. Later that day, another Liberty Healthcare psychologist performed a suicide assessment and concluded that Morton was faking his

///

suicidal ideations. *Id.* at ¶ 13. Following the assessment, Morton was returned to his isolation cell. *Id.* at ¶ 14.

Morton remained in the isolation cell for five days. *Id.* at ¶ 15. On May 17, 2020, Morton committed suicide by hanging himself with a bedsheet in his cell. *Id.* at ¶ 16.

The Third Amended Complaint states causes of action against the County of San Diego; Samantha Macanlalay, an intake nurse at the VDF; Liberty Healthcare, the contracted psychiatric provider for the jails in San Diego County; and Liberty Healthcare employees Bijan Rahmani, Hosanna Alto and Matthew Berlin. *Id.* at ¶¶ 25-30. Plaintiffs assert causes of action under 42 U.S.C. § 1983 for "objective indifference" (*id.* at ¶¶ 34-75), inadequate suicide prevention/self-harm policy and training program (*id.* at ¶¶ 76-112), and failure to summon medical care (*id.* at ¶¶ 113-125). Plaintiffs further allege claims under California law for a survival action, wrongful death and professional negligence. *Id.* at ¶¶ 126-151.

**B.   Critical Incident Review Board**

On November 18, 2020, the CIRB reviewed Morton's death, and a CIRB Report memorializing that meeting was generated on February 24, 2021. Dkt. No. 58-1 at 6, 7. These CIRB proceedings, and the documents generated from them, are the central focus of Plaintiffs' motion to compel.

San Diego Sheriff's Department Policy and Procedure Manual Section 4.23 contains the CIRB's purpose and procedures:

> The purpose of [the CIRB] is to consult with department legal counsel when an incident occurs which may give rise to litigation. The focus of the CIRB will be to assess the department's civil exposure as a result of a given incident. The CIRB will carefully review those incidents from multiple perspectives, including training, tactics, policies, and procedures with the ultimate goal of identifying problem areas and recommending actions so that potential liability can be avoided in the future.

Dkt. No. 58-1 at 15.[1]  Section 4.23 requires the CIRB to review all "critical incidents," which include "[i]n custody deaths, other than natural causes." *Id.* at 16.

The CIRB consists of three voting members and two non-voting members. *Id*. at 15. The three voting members include Sheriff's Department Commanders from the Law Enforcement, Court Services, and Detention Services Divisions. *Id*.  The two non-voting members are the Sheriff's Department Chief Legal Advisor and a Commander from Human Resources. *Id*.

Following a critical incident involving an in-custody death, the Sheriff's Department's Homicide Unit conducts an investigation.  Dkt. No. 79 at 28:7-9.  In preparation for the CIRB meeting, Sheriff's Department personnel prepare a PowerPoint presentation summarizing the incident and the investigation.  Dkt. Nos. 58-1 at 8-9 and 79 at 26:23-27:2; 108:20-23.

The CIRB review consists of both a "presentation session" and a "closed session." Dkt. Nos. 58-1 at 6 n.2 and 79 at 16:19-17:4.  At the presentation session, "the investigators involved in the investigation of the critical incident will present facts and circumstances to the members of the CIRB."  Dkt. No. 58-1 at 16.  CIRB members may question the investigators "regarding the specific facts and circumstances surrounding the critical incident." *Id*.[2]  Baranic testified that the presentation session "is where the information is

---

[1]   The Court draws the facts regarding the CIRB process from Section 4.23 as well as the declaration of Sheriff's Department Director of Legal Affairs and Chief Legal Advisor Michael Baranic, who testified at an evidentiary hearing on April 24, 2023.  Dkt. Nos. 58-1 and 79.

[2]   *Greer v. County of San Diego*, -- F. Supp. 3d. --, No. 19-cv-378-JO-DEB, 2022 WL 6258319 (S.D. Cal. Oct. 7, 2022), describes the CIRB meeting as occurring in three stages, with a second stage involving a discussion between the CIRB members and Sheriff's Department subject matter experts. *Id*. at *2.  The record in this case does not include information about that second stage, but that does not affect the Court's analysis.

presented to the board members, and we have the opportunity to ask questions of either the affected command or subject matter experts." Dkt. No. 79 at 16:25-17:3.

Following the presentation session, the CIRB meets in closed session. The only individuals present at the closed session are the five CIRB members and a Division of Inspectional Services Lieutenant acting as the "scribe." Dkt. No. 79 at 78:14. According to Section 4.23, "[a]fter hearing from all necessary parties, the three Commanders will vote to make a determination as to whether or not a policy violation may exist." Dkt. No. 58-1 at 16. If a majority of the three voting Commanders determine a policy violation may have occurred, the case is referred to Internal Affairs for further investigation. *Id*.

Where a majority of the voting Commanders do not find a potential policy violation, "the CIRB case will be forwarded to the Standards and Compliance Manager of the Division of Inspectional Services for the generation of a report, consistent with the Board's findings, at the conclusion of the CIRB." *Id*. at 17. The Lieutenant who served as the "scribe" prepares the CIRB report. Dkt. No. 79 at 78:14. Baranic testified that the CIRB Report may contain action items. *Id*. at 112:4-13. In addition, under section 4.23, the CIRB may make "recommendations for training based on the analysis of critical incidents" as well as "proposed policy recommendations" if it identifies "policy issues of concern while reviewing a critical incident." Dkt. No. 58-1 at 17.

Section 4.23 identifies two post-CIRB meeting requirements. First, with respect to critical incidents involving a Sheriff's Department employee, the employee's Facility or Unit Commander must brief the employee "as to the results of the CIRB" within seven days of the CIRB meeting. *Id*. Second, within 45 days of the CIRB, the Department of Inspectional Services must "prepare a report summarizing the actions and conclusions of the board." *Id*. The report "shall contain specific findings with regard to whether the review board found any policy violations, and training or policy issues, as well as what actions were taken by the department." *Id*.

///
///

In addition to these requirements, Baranic testified that, in the days following the CIRB review, he "tend[s] to have a standing meeting with the Sheriff and Undersheriff, and I will brief them on the CIRBs." Dkt. No. 79 at 112:1-3.

Plaintiffs' Exhibit 3 at the evidentiary hearing is the Sheriff's Department's response to the February 2022 California State Auditor report. According to the response:

> As items of concern are identified during a critical incident, such as an in-custody death, the CIRB reviews focus with an eye toward what changes have already been implemented by the chain of command to remedy any deficiencies before the matter admitted to the CIRB for review, as well as any changes the chain of command may not have already identified and/or implemented to minimize the risk of a reoccurrence.
>
> If the CIRB identifies any best practices or changes not previously identified and implemented by the change [sic] of command prior to this review, the CIRB is empowered to make such recommendations.

Dkt. No. 79 at 75:3-19. Baranic testified that this is "a purpose of CIRB but not the primary purpose of CIRB." *Id*. at 76:1-2.

### III.
### PROCEDURAL HISTORY

On February 27, 2023, Plaintiffs filed the instant motion to compel production of CIRB documents, CLERB documents and Liberty Healthcare emails responsive to Plaintiffs' requests for production. Dkt. No. 56. The County and Liberty Healthcare opposed the motion and provided the Court with the disputed documents for *in camera* review. On April 24, 2023, the Court held an evidentiary hearing to take testimony from Baranic and Dr. Frances Ysla, who submitted declarations in support of the oppositions to the motion to compel. Dkt. No. 79. Thereafter, the parties submitted supplemental briefing, and the Court held a second hearing on May 15, 2023. Dkt. No. 87.

///
///

# IV.
# DISCUSSION

## A. Attorney-Client Privilege

### 1. General principles

The Court applies federal law in analyzing Defendants' assertions of privilege in this federal civil rights action. *United States v. Zolin*, 491 U.S. 554, 562 (1989). "The attorney–client privilege is the oldest of the privileges for confidential communications known to the common law." *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981). "Its purpose is to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice." *Id*. "However, since the privilege has the effect of withholding relevant information from the fact-finder, it applies only where necessary to achieve its purpose" and "protects only those disclosures necessary to obtain informed legal advice which might not have been made absent the privilege." *Fisher v. United States*, 425 U.S. 391, 403 (1976).

The privilege "protects confidential communications between attorneys and clients, which are made for the purpose of giving legal advice." *In re Grand Jury*, 23 F.4th 1088, 1091 (9th Cir. 2021) (citation omitted). The elements of the privilege are: "(1) When legal advice of any kind is sought (2) from a professional legal adviser in his or her capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are, at the client's instance, permanently protected (7) from disclosure by the client or by the legal adviser (8) unless the protection be waived." *United States v. Martin*, 278 F.3d 988, 999 (9th Cir. 2002) (citation omitted). "Where the communication was made for dual-purposes, courts must determine 'whether the primary purpose of the communication is to give or receive legal advice, as opposed to business . . . advice.'" *Greer,* 2022 WL 6258319, at *4 (citing *In re Grand Jury*, 23 F.4th at 1091).

"Because it impedes full and free discovery of the truth, the attorney-client privilege is strictly construed." *Martin*, 278 F.3d at 999 (citation omitted). Moreover, "[t]he burden
/ / /

is on the party asserting the privilege to establish all the elements of the privilege." *Id*. at 999-1000.

There is no dispute that the County may invoke the attorney-client privilege for confidential communications between Sheriff's Department counsel and Sheriff's Department personnel so long as the County establishes that the communications meet the foregoing elements for privileged communications. *See In re Cnty. of Erie*, 473 F.3d 413, 418 (2d Cir. 2007) ("In civil suits between private litigants and government agencies, the attorney-client privilege protects most confidential communications between government counsel and their clients that are made for the purpose of obtaining or providing legal assistance."). This is because "[a]ccess to legal advice by officials responsible for formulating, implementing and monitoring governmental policy is fundamental to promot[ing] broader public interests in the observance of law and administration of justice." *Id*. at 419 (citation omitted).

## 2. **CIRB Report**

At the outset, the Court acknowledges that it does not write on a blank slate in considering whether the CIRB Report is covered by the attorney-client privilege. In *Bush v. County of San Diego*, No. 15CV686-L (JMA), Dkt. No. 22 (S.D. Cal. Nov. 24, 2015), the court declined to compel production of a CIRB Report based on a declaration from then-Sheriff's Department Chief Legal Advisor Robert Faigin stating that the Report "is a confidential communication involving the County's employees and Faigin, in his capacity as a legal advisor, and that it was prepared for the purpose of obtaining legal advice related to the subject incident." *Id.* at 8. Similarly, in *Estate of Ruben Nunez v. County of San Diego*, No. 16cv1412-BEN-MDD, Dkt. No. 186 (Sept. 11, 2017), the court declined to compel production of a CIRB Report based on a declaration from Faigin stating that "the purpose of the [CIRB] meeting was to obtain legal advice in advance of potential litigation." *Id*. at 3.

More recently, the *Greer* court applied the "primary purpose" test adopted by the Ninth Circuit in *In re Grand Jury* to CIRB investigations. *Greer*, 2022 WL 6258319, at

**5-7. The *Greer* court conducted a detailed analysis of Section 4.23 and concluded that "the objective evidence before the Court establishes the CIRB's primary purpose is investigative and remedial (activities generally not protected by the attorney-client privilege), and the County has not carried its burden of establishing the primary purpose of the twelve CIRB investigations at issue was obtaining legal advice." *Id.* at *7. The District Judge affirmed that ruling and thereafter conducted an *in camera* review of the CIRB Reports at issue. Following the *in camera* review, the District Judge affirmed the prior ruling that the CIRB Reports were not privileged. *See* Dkt. No. 61-1 at 59 (transcript of February 8, 2023 hearing in *Greer* in which the District Court concluded that "the CIRB memoranda reports and documents are not privileged because their primary purpose is to determine training issues and recommend remedial measures in response to serious incidents that occur within the County jails, as opposed to giving or seeking legal advice from or by the chief legal officer").

Against this backdrop, the Court turns to the CIRB Report at issue in this case. The County bears the burden to establish that the CIRB meeting on November 18, 2020 included confidential communications between attorney and client that were "made for the purpose of giving legal advice." *In re Grand Jury*, 23 F.4th at 1091. If so, the attorney-client privilege would extend to a document that "memorializes and reflects legal advice rendered in a privileged conversation." *Chrimar Sys. Inc. v. Cisco Sys. Inc.*, No. 13-CV-01300-JSW(MEJ), 2016 WL 1595785, at *3 (N.D. Cal. Apr. 21, 2016).

The County points out that the stated purpose of the CIRB is to "consult with department legal counsel when an incident occurs which may give rise to litigation" and "assess the department's civil exposure as a result of a given incident." Dkt. No. 58-1 at 15. Baranic's declaration states that the CIRB's "primary purpose is providing legal advice to the Department, assessing the Department's civil liability, and risk exposure [] in anticipation of potential litigation as a result of a given incident." Dkt. No. 58-1 at 4. At the evidentiary hearing, Baranic similarly testified that the "sole purpose" of the CIRB is to examine critical incidents "from a liability standpoint." Dkt. No. 79 at 83:24-25. He

further testified that the CIRB Report is generated "to memorialize the discussions and [] any legal advice that was given during the CIRB process." *Id.* at 90:8-9.

In determining whether the CIRB Report was "made for the purpose of giving legal advice," *In re Grand Jury*, 23 F.4th at 1091, the Court begins with the provisions of Section 4.23 that govern the CIRB process. As noted above, at the presentation session, "the investigators involved in the investigation of the critical incident will present facts and circumstances to the members of the CIRB." Dkt. No. 58-1 at 16. Thereafter, the five CIRB members meet in closed session where "the three Commanders will vote to make a determination as to whether or not a policy violation may exist." Dkt. No. 58-1 at 16. In addition, the CIRB may make training recommendations and "proposed policy recommendations." Dkt. No. 58-1 at 17. Finally, Section 4.23 requires the preparation of a CIRB Report that "shall contain specific findings with regard to whether the review board found any policy violations, and training or policy issues, as well as what actions were taken by the department." *Id*.

The requirements established by Section 4.23 that the CIRB vote on the existence of policy violations and make findings as to any policy violations and "training or policy issues" exist independent of any legal advice that may be provided by the Chief Legal Advisor, who serves as a non-voting CIRB member. Stated another way, the CIRB could fulfill its duties under Section 4.23 to vote on policy violations and address training or policy issues absent any legal advice from the Chief Legal Advisor. That legal advice from the Chief Legal Advisor is not necessary for the CIRB to fulfill these duties weighs against a finding that the primary purpose of the CIRB meeting is to "give or receive legal advice." *In re Grand Jury*, 23 F.4th at 1091.

The Court's own review of the CIRB Report further supports the conclusion that the primary purpose of the CIRB meeting itself was not to seek or receive legal advice that would justify asserting the attorney-client privilege as to the entire CIRB report. *United States v. Chevron Corp.*, No. C 94-1885 SBA, 1996 WL 444597, at *2 (N.D. Cal. May 30, 1996) ("The court may conduct an *in camera* review of withheld documents to allow the

client to demonstrate to the court that the attorney-client privilege applies to segregable portions of the withheld documents."). The CIRB Report dated February 17, 2021, memorializes the presentation and closed sessions of the CIRB meeting on November 18, 2020. On its face, the CIRB Report does not describe any legal advice provided by the Chief Legal Advisor.[3] At the evidentiary hearing, the Court marked the CIRB Report as Court Exhibit 3 and asked Baranic about its contents in general terms given that it had not been produced to Plaintiffs pending the Court's determination as to privilege. Baranic testified that highlighted portions on pages two and three reflect "Mr. Faigin soliciting information where he would render legal advice that would be acted on by the board members." Dkt. No. 79 at 119:6-9. These highlighted portions consist of one question posed by Faigin during the presentation session and four questions posed during the closed session and the respective responses. The CIRB Report does not reflect legal advice provided by Faigin as a result of the information provided in response to these questions.

The Court credits Baranic's testimony that, from his perspective as the Chief Legal Advisor, his role in the CIRB is to provide legal advice. But the issue presented is whether the primary purpose of the communications at the CIRB meeting on November 18, 2020 was to provide legal advice such that the entire CIRB Report is subject to the attorney-client privilege. *In re Grand Jury*, 23 F.4th at 1091. As the Second Circuit explained, "[t]he predominant purpose of a communication cannot be ascertained by quantification or classification of one passage or another; it should be assessed dynamically and in light of the advice being sought or rendered, as well as the relationship between advice that can be rendered only by consulting the legal authorities and advice that can be given by a non-lawyer." *In re Cnty. of Erie*, 473 at 420–21. Here, legal advice is not necessary for the CIRB to comply with the requirements of Section 4.23, and the CIRB Report in this matter does not, on its face, contain legal advice provided by the Chief Legal Advisor. On this

---

[3]     Faigin was the Chief Legal Advisor in November 2020 and attended the CIRB meeting in that capacity. Baranic assumed the Chief Legal Advisor role thereafter.

record, the County has not carried its burden to establish that the primary purpose of the communications at the CIRB meeting was to seek or provide legal advice. As such, the Court concludes that the attorney-client privilege does not apply to the CIRB Report in its entirety.

This does not end the analysis because "redaction is available for documents which contain legal advice that is incidental to the nonlegal advice that is the predominant purpose of the communication." *Id.* at 421. *Cf. Chevron Corp.*, 1996 WL 444597, at *2 ("[D]espite the overall nature of the document, the client may assert the attorney-client privilege over isolated sentences or paragraphs within a document."). Having examined the CIRB Report, the Court concludes that the communications between Faigin and Sheriff's Department personnel memorialized in the "Training and Tactics" section on pages two and three of the CIRB Report should be redacted.

### 2.   Additional CIRB-Related Documents

The Court has conducted an *in camera* review of the 40 documents identified in the County's initial and supplemental "Privilege Log Re CIRB-Related Records" and concludes that the County has not carried its burden to establish that any of these documents are subject to the attorney-client privilege for the reasons described above.

### 3.   County's Privilege Log Re Emails

The County has provided a "Privilege Log Re Emails" identifying 93 emails as to which it asserts the attorney-client privilege. The County asserts the attorney-client privilege over these emails, which include discussions about press releases and other issues relating to Morton's death. However, the County's briefing does not explain why these emails are privileged, and the Court's *in camera* review indicates that the emails are not confidential attorney-client communications "which are made for the purpose of giving legal advice." *In re Grand Jury*, 23 F.4th at 1091 (citation omitted). Based on the current record, the County has failed to carry its burden to establish that the attorney-client privilege applies to these documents.

/ / /

### 3. CLERB Documents

The County's "Privilege Log re CLERB-Related Records" contains eight documents. The County asserts the attorney-client privilege as to Documents 2, 6, 7, and 8, but the County's briefing does not explain how these documents are confidential attorney-client communications. The Court's *in camera* review indicates that the documents include communications between non-attorneys that do not appear to involve any advice from counsel, and the Court concludes that the County has failed to meet its burden to establish that the attorney-client privilege applies to these documents.

## B. Work Product Doctrine

### 1. General Principles

"The work-product doctrine is a qualified privilege that protects from discovery documents and tangible things prepared by a party or his representative in anticipation of litigation." *United States v. Sanmina Corp.*, 968 F.3d 1107, 1119 (9th Cir. 2020) (citations omitted). "At its core, the work-product doctrine shelters the mental processes of the attorney, providing a privileged area within which he can analyze and prepare his client's case, and protects both material prepared by agents for the attorney as well as those prepared by the attorney himself." *Id.* (citation omitted). The doctrine "upholds the fairness of the adversarial process by allowing litigators to creatively develop legal theories and strategies – without their adversaries invoking the discovery process to pry into the litigators' minds and free-ride off them." *In re Grand Jury*, 23 F.4th at 1093; *see also* Fed. R. Civ. P. 26(b)(3)(A) ("Ordinarily, a party may not discover documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative . . .").

"In circumstances where a document serves a dual purpose, that is, where it was not prepared exclusively for litigation, then the 'because of' test is used." *United States v. Richey*, 632 F.3d 559, 567–68 (9th Cir. 2011) (citation omitted). "In applying the 'because of' standard, courts must consider the totality of the circumstances and determine whether the document was created because of anticipated litigation, and would not have been

created in substantially similar form but for the prospect of litigation." *Id*. (citation omitted). "The party asserting work product protection has the burden to demonstrate it applies to the information in question." *Greer*, 2022 WL 6258319, at *4.

### 2. CIRB Documents

Sheriff's Department Policy Section 4.23 requires the CIRB to review all "critical incidents," which include "[i]n custody deaths, other than natural causes." Dkt. No. 58-1 at 16. Section 4.23 applies to all "critical incidents" regardless of whether the County has received notice of litigation arising from the incident at issue. Dkt. No. 79 at 22:25-23:15.

The work product doctrine applies if the County establishes that the CIRB Report "would not have been created in substantially similar form but for the prospect of litigation." *Richey*, 632 F.3d at 568. The Court concludes that the County has not met this burden because Section 4.23 mandates the CIRB review process for all critical incidents whether or not litigation is anticipated. *See Kelly v. City of San Jose*, 114 F.R.D. 653, 659 (N.D. Cal. 1987) ("Since police departments are under an affirmative duty, in the normal course of serving their public function, to generate the kind of information at issue here, the policies that inspire the work product doctrine are wholly inapplicable."); *Martin v. Evans*, No. C 08-4067 JW MEJ, 2012 WL 1894219, at *5 (N.D. Cal. May 23, 2012) (overruling work-product objection to production of prison internal affairs reports where prison "fails to demonstrate how the reports were generated primarily for use in litigation or collected outside the regular course of business"); *Greer*, 2022 WL 6258319, at **7-8 (finding County did not establish that work product doctrine applied to CIRB reports).

### 3. CLERB Documents

The County's "Privilege Log re CLERB-Related Records" asserts that Documents 2, 6, 7, and 8 were "prepared in anticipation of litigation," but this appears to be a boilerplate objection as it is not mentioned in the County's briefing. The Court concludes that the County has failed to meet its burden to establish that the work product doctrine applies to these documents.

/ / /

### 4. Liberty Healthcare Emails

On May 18, 2020, three Liberty Healthcare employees exchanged emails regarding Morton's death. The emails include three exchanges: (1) emails between Matthew Berlin and Jake Villanueve, (2) emails between Villanueve and Dr. Frances Ysla and (3) emails between Dr. Ysla and Christopher Kagay. Liberty Healthcare asserts that the emails "were exchanged primarily, if not exclusively, in anticipation of litigation." Dkt. No. 59 at 4.

Dr. Ysla was Liberty's medical director at the time. Dkt. No. 79 at 9:3-5. His declaration states that Liberty provides psychiatric services to the County of San Diego. Dkt. No. 59-1 at 2. Whenever there is an in-custody suicide, Dr. Ysla's duties "are to conduct a timely review of the individual's clinical chart as concerns the jail-based mental health care provided to the decedent" and "consider whether our mental health services were provided within the appropriate standard of care." *Id*.

On May 18, 2020, Villanueve, Liberty Healthcare's program director, emailed Dr. Ysla regarding Morton's suicide:

> There was an apparent suicide at Vista last night. Can you look into this and provide some thoughts on any exposure you think we might have?

Privilege Log Item SD 04500. At the evidentiary hearing, Dr. Ysla testified that it was his practice to conduct a review of "any suicide" of "an individual that had an engagement with mental health." *Id*. at 9:16-25. Dr. Ysla agreed this was "a custom and practice that would happen every time there was an in-custody suicide where they sought treatment." *Id*. at 10:6-10.

Liberty Healthcare must establish that the emails "would not have been created in substantially similar form but for the prospect of litigation." *Richey*, 632 F.3d at 568. Villanueve's request that Dr. Ysla "provide some thoughts on any exposure you think we might have" supports the argument that the subsequent emails were prepared in anticipation of litigation. However, the record also shows that Dr. Ysla would have conducted a review of Morton's suicide irrespective of this request, and the subsequent

emails between Dr. Ysla and Kagay regarding interactions with Morton prior to his death are consistent with the type of review that Dr. Ysla testified he would conduct for every in-custody suicide of an individual who had received treatment from Liberty Healthcare. Dkt. No. 59-1 at 9:16-25, 10:6-10. As such, the Court concludes that Liberty Healthcare has not met its burden to show that the emails would not have been sent "but for the prospect of litigation." *Richey*, 632 F.3d at 568.

## C.   Official Information Privilege

In a one-sentence argument, the County asserts that the official information privilege protects the CIRB Report from disclosure. Dkt. No. 68 at 12. The Court disagrees.

"Federal common law recognizes a qualified privilege for official information." *Sanchez v. City of Santa Ana*, 936 F.2d 1027, 1033 (9th Cir.1990) (citation omitted). "In determining what level of protection should be afforded by this privilege, courts conduct a case by case balancing analysis, in which the interests of the party seeking discovery are weighed against the interests of the governmental entity asserting the privilege." *Soto v. City of Concord*, 162 F.R.D. 603, 613 (N.D. Cal. 1995).

The discoverability of official documents should be determined under the "balancing approach that is moderately pre-weighted in favor of disclosure." *Kelly v. City of San Jose*, 114 F.R.D. 653, 661 (N.D. Cal. 1987). The party asserting the privilege must properly invoke the privilege by making a "substantial threshold showing." *Id*. at 669. "In order to fulfill the threshold requirement, the party asserting the privilege must submit a declaration or affidavit from a responsible official with personal knowledge of the matters to be attested to in the affidavit. The affidavit must include: (1) an affirmation that the agency generated or collected the material in issue and has maintained its confidentiality; (2) a statement that the official has personally reviewed the material in question; (3) a specific identification of the governmental or privacy interests that would be threatened by disclosure of the material to plaintiff and/or his lawyer; (4) a description of how disclosure subject to a carefully crafted protective order would create a substantial risk of harm to significant governmental or privacy interests, and (5) a projection of how much harm

would be done to the threatened interests if disclosure were made." *Soto*, 162 F.R.D. at 613 (citation omitted).

"If the nondisclosing party does not meet this initial burden, the court will order disclosure of the documents; if the party meets this burden, the court generally conducts an *in camera* review of the material and balances each party's interests." *Rogers v. Giurbino*, 288 F.R.D. 469, 481 (S.D. Cal. 2012) (overruling privilege claim where defendant did not submit appropriate declaration). Here, the County does not assert that Baranic's declaration – which focuses entirely on the attorney-client privilege – also supports application of the official information privilege. Assuming Baranic's declaration makes the requisite "substantial threshold showing," the Court has conducted an *in camera* review of the CIRB Report and considered "the interests of the party seeking discovery . . . against the interests of the governmental entity asserting the privilege." *Soto*, 162 F.R.D. at 613. The Court concludes that this balancing analysis weighs in favor of disclosure to the Plaintiffs under the existing protective order and that the County may not rely on the official information privilege to withhold the CIRB Report.

## V.
## **CONCLUSION**

For all the foregoing reasons, Plaintiffs' motion to compel is GRANTED IN PART and DENIED IN PART. By not later than **July 3, 2023**, Defendants must produce to Plaintiffs the documents identified in Defendants' privilege logs with redactions to the CIRB Report as specified above.

/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /

1  |  This Order corrects an error in the Court's June 20, 2023 Order at page 2, lines 11-12.  To avoid confusion, the Clerk of the Court is respectfully requested to STRIKE the June 20, 2023 Order [Dkt. No. 96] from the docket.

**IT IS SO ORDERED.**

Dated: June 27, 2023

*David Leshner*

Hon. David D. Leshner
United States Magistrate Judge