1
2
3
4
5
6
7
8                    UNITED STATES DISTRICT COURT
9                   SOUTHERN DISTRICT OF CALIFORNIA
10

| | |
|---|---|
| 11  MARILYN MORTON, et al., | Case No. 21-cv-1428-MMA-DDL |
| 12                    Plaintiffs, | **ORDER GRANTING IN PART** |
| 13          vs. | **COUNTY DEFENDANT'S MOTION** |
| 14 | **FOR SUMMARY JUDGMENT;** |
| 15  COUNTY OF SAN DIEGO, et al., | [Doc. No. 219] |
| 16                    Defendants. | |
| 17 | **GRANTING IN PART COUNTY** |
| | **DEFENDANTS'** *DAUBERT* **MOTION** |
| 18 | **RE DR. JEFFREY METZNER; AND** |
| 19 | [Doc. No. 220] |
| 20 | **DENYING COUNTY DEFENDANTS'** |
| 21 | ***DAUBERT* MOTION RE** |
| 22 | **DR. KAYCEA CAMPBELL** |
| 23 | [Doc. No. 221] |
| 24 | |
| 25 | <u>**CASE PARTICIPANTS ONLY**</u> |
| 26 | |
| 27 | |
| 28 | |

Marilyn Morton ("Ms. Morton), as successor in interest to Decedent Joseph Earl Morton's estate, as well as Ms. Morton and Dean Morton as individuals (collectively, "Plaintiffs"), bring this action pursuant to 42 U.S.C. § 1983 against the County of San Diego (the "County"), Bijan Rahmani, Hosanna Alto, Matthew Berlin, Liberty Healthcare ("Liberty"), Janine Sparks, and Christopher Kagay, and Does 1–10.  *See* Doc. No. 190 ("Fourth Amended Complaint" or "FAC").  On May 31, 2024, the County, Alto, and Sparks (collectively, the "County Defendants") filed a motion for summary judgment, along with two motions to exclude certain opinions offered by Plaintiffs' experts.  *See* Doc. Nos. 219–21.  The Court found these matters suitable for determination on the papers and without oral argument pursuant to Federal Rule of Civil Procedure 78(b) and Civil Local Rule 7.1.d.1.  *See* Doc. No. 245.  For the following reasons, the Court **GRANTS IN PART** and **DENIES IN PART** County Defendants' motion for summary judgment, **GRANTS IN PART** their motion to exclude the opinion and testimony of Dr. Jeffrey Metzner, and **DENIES** their motion to exclude the opinion and testimony of Dr. Kaycea Campbell.

## I. BACKGROUND[1]

On May 11, 2020, Joseph Earl Morton ("Mr. Morton") approached a man sitting in a vehicle with his children and demanded cash while brandishing a fake gun.  Doc. No. 243-3 ("County Defendants' Separate Statement" or "CDSS") Nos. 1–2; Def. Ex. 1.[2] He later used the victim's credit card at a Walmart, where he was ultimately arrested in the parking lot by the San Diego County Sheriff's Department.  Def. Ex. 1 at 21.[3]  During the arrest, Mr. Morton told the arresting officers that he had just been released the day

---

[1] These material facts are taken from the County Defendants' separate statement of undisputed material facts and Plaintiffs' responses thereto, as well as the parties' supporting declarations and exhibits. Disputed material facts are discussed in further detail where relevant to the Court's analysis.  Facts that are immaterial for purposes of resolving the current motions are not included in this recitation.

[2] The Court hereinafter refers to the County Defendants' exhibits, filed at Doc. Nos. 233 (Part 1), 219-4 (Part 2), and 219-5 (Part 3) by exhibit number.

[3] Unless otherwise noted, all citations include the pagination assigned by the CM/ECF system.

before, on May 10, from a 72-hour hold pursuant to California Welfare & Institution Code § 5150 ("5150 hold") after an attempted suicide by carbon monoxide poisoning. CDSS No. 3; Def. Ex. 2 at 33, 36. Mr. Morton was booked at Vista Detention Facility ("VDF") for attempted robbery, stolen property/ID, and willful cruelty to child without injury or death. CDSS No. 1; Def. Ex. 1.

Nurse Samantha Macanlalay conducted his intake medical screening at VDF on May 11 at around 6:30 p.m. CDSS No. 4; Def. Ex. 2. During his intake, Mr. Morton reported, among other things, that he suffered from major depression, had thoughts of suicide, recently experienced the death of his aunt, and felt hopeless and helpless due to alcoholism. Def. Ex. 2 at 24–26. Mr. Morton was flagged as a suicide risk and was referred to Liberty psychologist Dr. Bijan Rahmani. CDSS No. 4. Nurse Macanlalay also initiated alcohol withdrawal protocol ("CIWA"), noting that Mr. Morton was asymptomatic but was anticipating alcohol withdrawal. CDSS No. 5; Def. Ex. 3.

At 7:06 p.m., Dr. Rahmani performed an initial gatekeeping assessment of Mr. Morton to evaluate his suicide risk and determine housing placement. CDSS No. 6. According to Dr. Rahmani's assessment, the "Reason for Assessment/Placement" was that Mr. Morton was "actively self harming" and "verbalized SI/HI." Def. Ex. 4 at 53. Dr. Rahmani noted that Mr. Morton had a previous suicide attempt and was recently released from a 5150 hold. CDSS No. 9; Def. Ex. 4 at 53. Dr. Rahmani also recorded that Mr. Morton was "still thinking about suicide but does not have any plans." CDSS No. 9; Def. Ex. 4 at 53. Dr. Rahmani determined that Mr. Morton was a low risk of suicide, placed him in the Inmate Safety Program ("ISP") in Enhanced Observation Housing ("EOH"), and referred Mr. Morton for psychiatric medication evaluation in 24 hours. CDSS No. 8; Def. Ex. 4 at 61–62. He also scheduled Mr. Morton for a Psychiatric Sick Call to take place within 24 hours with Liberty Nurse Practitioner Christopher Kagay. CDSS No. 10; Def. Ex. 4 at 62.

Mr. Morton arrived in EOH at 7:40 p.m., and Nurse Lindsey Jameson noted that he had a steady gait, even and unlabored breathing, and was not in distress at that time.

CDSS No. 11; Def. Ex. 25 at 158.  At 9:30 p.m., Nurse Paul Mata performed a wellness check on Mr. Morton and recorded that Mr. Morton denied suicidal ideation, showed no signs of acute medical distress, and presented upbeat.  CDSS No. 12; Def. Ex. 7.

The following morning, on May 12, 2020 at 5:14 a.m., Mr. Morton was seen for a second stage nurse evaluation.  CDSS No. 13; Def. Ex. 8.  Nurse Jameson "confirmed CIWA protocol for withdrawal treatment."  CDSS No. 13; Def. Ex. 8.

At 7:23 a.m., County Mental Health Clinician ("MHC") Hosanna Alto completed Mr. Morton's second ISP assessment.  CDSS No. 14; Def. Ex. 9.  The parties dispute whether Mr. Morton showed signs or symptoms that he was experiencing suicidal ideations during this assessment.  CDSS No. 15.  But it is undisputed that when he was asked by MHC Alto, Mr. Morton denied having suicidal ideations.  CDSS No. 15; Def. Ex. 9 at 75, 84.  MHC Alto noted that Mr. Morton reported he was struggling with the symptoms of alcohol withdrawal and that his prior suicide attempt was due to feeling overwhelmed by his alcohol abuse.  Def. Ex. 9 at 75.  She also recorded that Mr. Morton had support from his girlfriend, with whom he had been "talking to all night via phone," and that he planned to enter rehabilitation after his release.  Def. Ex. 9 at 75.  MHC Alto determined that Mr. Morton was a low risk for suicide, noting that he denied suicidal ideations, reported that the prior suicide attempt was related to alcohol abuse, expressed a desire to resume antidepressants and return to rehab, was hopeful about the future, had support from his girlfriend, and was calm and cooperative.  CDSS No. 17; Def. Ex. 9 at 84.  MHC Alto also noted that Mr. Morton had a 24-hour ISP follow-up evaluation already scheduled.  CDSS No. 21; Def. Ex. 9 at 85.

As a result of MHC Alto's low risk designation, Mr. Morton was cleared from EOH, released from ISP, and moved to the housing module.  CDSS Nos. 20, 22; Def. Ex. 9 at 84, 86 ("Given 2nd low-risk designation and cleared to JPMU on 5/12/20 @0723."); Def. Ex. 10.

Once in the housing module, at approximately 2:20 p.m., Mr. Morton told Deputy Marc Myers that he was suicidal, and when asked if he had a plan, told the deputy: "I

would use my blanket to hang myself!" CDSS No. 23; Def. Ex. 50 at 105:11–23;[4] Def. Ex. 13 at 107. Deputy Myers escorted Mr. Morton to medical where he was evaluated by Nurse Myra Rada and Liberty Psychologist Dr. Matthew Berlin. CDSS Nos. 24–26; Def. Ex. 13 at 107. Nurse Rada reported that Mr. Morton was claiming suicidal ideation—"I will do it with a sheet"—but that he was not in distress and had no signs of alcohol withdrawal. CDSS No. 25; Def. Ex. 25 at 158. At 2:23 p.m., Dr. Berlin performed an ISP gatekeeping assessment. CDSS No. 26; Def. Ex. 12. Dr. Berlin recorded that Mr. Morton denied suicidal ideation and "reported that what he really wanted was to make some phone calls" and that he had previously been able to make calls in EOH. Def. Ex. 12 at 93; Def. Ex. 13 at 107 ("Per GK Berlin, during the assessment, Morton said he wanted to go back into EOH because he did not have to wait for dayroom time to use the phone. Morton said he was not suicidal, he just wanted to use the phone."). Mr. Morton also reported to Dr. Berlin that he had been sober for ten months but had relapsed approximately a month and a half prior, was "upset with how upset he has made his mother and girlfriend," with whom he had been in contact with on the phone over the previous day, and that he had plans to go to get bailed out and to go to rehab. Def. Ex. 12 at 9. Dr. Berlin determined that placement in ISP was not indicated and therefore not recommended. CDSS No. 27; Def. Ex. 12 at 102, 104.

On May 13, 2020, Nurse Practitioner Christopher Kagay was the onsite psychiatric provider at VDF. CDSS No. 31. Nurse Kagay completed Mr. Morton's Chart Check, which included reviewing Dr. Berlin's gatekeeping assessment notes and Mr. Morton's CVS Pharmacy records. CDSS No. 32; Def. Ex. 14. He determined that Mr. Morton did not require immediate medication evaluation. CDSS No. 32. Nurse Kagay cancelled the May 13th 24-hour Psych Sick Call appointment and scheduled a new appointment for May 20. CDSS No. 34.

---

[4] All citations to deposition transcripts refer to the pagination assigned by the reporter.

Between May 13, 2020 and May 15, 2020, VDF medical staff assessed Mr. Morton for alcohol withdrawal follow-ups and x-rays, completed Chart Checks, and administered medication to him.  CDSS No. 37; Def. Exs. 15, 17, 19, 22, 23.  On May 14, 2020, Mr. Morton was cleared from CIWA protocol.  CDSS No. 39; Def. Ex. 18.

From May 12, 2020 through May 16, 2020, MHC Janine Sparks was responsible for "MHC sick call and follow-up appointments for patients across five (5) housing modules" at VDF, including Mr. Morton's.  CDSS Nos. 40–41.  The parties dispute the reasoning, but it is undisputed that MHC Sparks did not complete Mr. Morton's follow-up appointment and therefore did not observe, interact, or communicate with Mr. Morton between May 12 and 16.  CDSS Nos. 42, 44.

The parties agree that between May 12 and May 17, 2020, Mr. Morton threatened to commit suicide over the phone to his mother, Ms. Morton, and his girlfriend, Elaine Luong, on six (6) separate occasions.  CDSS No. 46; Def. Ex. 31 at 246 (May 12 call to Ms. Morton), 250 (May 15 call to Ms. Morton), 257–58 (May 16 call to Ms. Luong), 261–68 (May 16 call to Ms. Morton), 270–75 (May 17 call to Ms. Morton), 278 (May 17 call to Ms. Luong).

On the evening of May 17, 2020, Mr. Morton committed suicide by hanging himself in his cell.  CDSS No. 47; Def. Ex. 24.

## II. PRELIMINARY MATTERS

There are a few matters the Court must first address before turning to the substance of the County Defendants' motions: first, the parties' evidentiary objections; second, the parties' peripheral reference to a substitution of Plaintiff Dean Morton; and third, County Defendants' request for judicial notice.  The Court addresses these matters in turn.

### A.   Evidentiary Objections

First, both parties have lodged evidentiary objections to the other's evidence.  Doc. No. 238-3 ("Pl. Evid. Obj."); Doc. No. 243-4 ("Def. Evid. Obj.").  The Court begins with the general position that most, if not all, evidentiary objections are inappropriate at summary judgment.  "A trial court can only consider admissible evidence in ruling on a

motion for summary judgment." *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 773 (9th Cir. 2002). However, at the summary judgment stage, district courts consider evidence with content that would be admissible at trial, even if the form of the evidence would not be admissible at trial. *See Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003); *Block v. City of Los Angeles*, 253 F.3d 410, 418–19 (9th Cir. 2001) (explaining that at summary judgment, "a party does not necessarily have to produce evidence in a form that would be admissible at trial"). "Rule 56[(c)] requires only that evidence 'would be admissible,' not that it presently be admissible." *Burch v. Regents of Univ. of Cal.*, 433 F. Supp. 2d 1110, 1120 (E.D. Cal. 2006); *see also Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 657 F.3d 936, 964 n.7 (9th Cir. 2011) ("Rule 56 is precisely worded to exclude evidence only if it's clear that it cannot be presented in an admissible form at trial."). Thus, "[t]he focus is on the admissibility of the evidence's contents, not its form." *Estate of Hernandez-Rojas ex rel. Hernandez v. United States*, 62 F. Supp. 3d 1169, 1174 (S.D. Cal. 2014) (citing *Fonseca v. Sysco Food Servs. of Ariz., Inc.*, 374 F.3d 840, 846 (9th Cir. 2004)).

For these reasons, objections such as lack of foundation, speculation, hearsay, relevance, or that evidence is argumentative or constitutes an improper legal conclusion "are all duplicative of the summary judgment standard itself" and unnecessary to consider here. *Burch*, 433 F. Supp. 2d at 1119; *see also Obesity Research Inst., LLC v. Fiber Research Int'l, LLC*, 310 F. Supp. 3d 1089, 1107 (S.D. Cal. 2018) (collecting cases). Moreover, Federal Rule of Evidence 403 objections are unnecessary at the summary judgment stage because there is no jury that can be misled and no danger of confusing the issues. *See Montoya v. Orange Cnty. Sheriff's Dep't*, 987 F. Supp. 2d 981, 994 (C.D. Cal. 2013) (stating that courts "need not exclude evidence at the summary judgment stage for danger of unfair prejudice, confusion of the issues, or any other grounds outlined in Rule 403").

With this in mind, the Court turns to the parties' objections. First, Plaintiffs object to the declarations of Alto and Sparks. *See* Pl. Evid. Obj. In particular, Plaintiffs

challenge paragraphs 4 and 5 in Alto's declaration and paragraphs 5, 6, and 7 in Sparks' declaration on the grounds that this evidence lacks foundation, Fed. R. Evid. 602, and is irrelevant, Fed. R. Evid. 401, 402. *Id.* The Court **OVERRULES** these objections. As discussed above, objections for lack of foundation or relevance are not appropriate at summary judgment. Moreover, the Court finds that the challenged evidence can be offered in admissible form at trial. Further, to the extent Plaintiffs assert by way of their evidentiary objections that this evidence "mischaracterizes the evidence," the Court notes that this argument is not an objection to the admissibility of the evidence but a challenge to the import of the evidence and is therefore not an appropriate evidentiary objection. *See Stonefire Grill, Inc. v. FGF Brands, Inc.*, 987 F. Supp. 2d 1023, 1033 (C.D. Cal. 2013) (declining to "consider the parties' objections aimed at the characterization of or purported misstatement of the evidence").

Next, County Defendants object to Plaintiffs' evidence submitted in opposition to the pending motions. *See* Def. Evid. Obj. First, County Defendants object to Plaintiffs' filing of an oversized opposition brief. *Id.* at 3. This, of course, is not an evidentiary objection, nor is Plaintiffs' memorandum evidence. And notably, County Defendants themselves filed an oversized brief. Doc. No. 243. Regardless, the Court granted Plaintiffs and County Defendants leave to file oversized briefs. Doc. No. 246. So the Court **OVERRULES** this objection.

County Defendants also object to Plaintiffs' responses to their Separate Statement. Def. Evid. Objs. at 3–8.[5] The Court **OVERRULES** these objections in their entirety. First, these are boilerplate objections devoid of any specific analysis. *See Amaretto Ranch Breedables v. Ozimals Inc.*, 907 F. Supp. 2d 1080, 1081 (N.D. Cal. 2012) ("This Court need not address boilerplate evidentiary objections that the parties themselves

---

[5] County Defendants' evidentiary objections do not comply with the undersigned's Civil Chambers Rules. *See* Civ. Chambers R. IV ("If filed as a separate document, evidentiary and procedural objections may not exceed five (5) pages in length.").

deem unworthy of development.").  More importantly a party's separate statement of undisputed material facts is not evidence, it is a tool designed to assist courts with determining whether the moving party has met their burden.  At summary judgment, courts rely on the underlying evidence, not the statements contained within a separate statement of undisputed material facts, *Bischoff v. Brittain*, 183 F. Supp. 3d 1080, 1084 (E.D. Cal. 2016) ("The court's decision relies on the evidence submitted rather than how that evidence is characterized in the statements."); *AFMS LLC v. UPS Co.*, 105 F. Supp. 3d 1061, 1071 (C.D. Cal. 2015), and therefore challenges should be directed at the evidence supporting those statements instead, *Holt v. Noble House Hotels & Resort, Ltd*, 370 F. Supp. 3d 1158, 1164 (S.D. Cal. 2019) (citing *Hanger Prosthetics & Orthotics, Inc. v. Capstone Orthopedic, Inc.*, 556 F. Supp. 2d 1122, 1126 n.1 (E.D. Cal. 2008) (noting that the parties' "evidentiary objections to [their adversary's] separate statements of undisputed facts are not considered because such objections should be directed at the evidence supporting those statements")).

County Defendants' two remaining objections are to eight paragraphs in attorney Danielle Pena's declaration as well as Plaintiffs' expert Dr. Metzner's report.  The Court similarly **OVERRULES** these objections.  As to Ms. Pena's Declaration, County Defendants offer the following laundry list of evidentiary objections to eight distinct paragraphs:

> **Grounds for Objection:** This is a legal argument. Improper expert opinion (FRE 602, 701-702); calls for speculation and conclusory (FRE 901-902, 1000-1004); and improper opinion and impermissible expert opinion (FRE 701-702). This is not proper matter for summary judgment evidence and is hearsay, irrelevant.

Def. Evid. Obj. at 3.

This is insufficient.  The Court will not scrutinize and provide a full analysis of identical boilerplate objections to separate pieces of evidence.  *See, e.g.*, *Marketquest Grp. Inc. v. BIC Corp.*, 316 F. Supp. 3d 1234, 1253 (S.D. Cal. 2018).  And in any event,

these paragraphs do not contain improper legal argument, expert opinion, speculation, hearsay, or irrelevant evidence.

As to Dr. Metzner's report, County Defendants lodge the following objections:

> Grounds for Objection: Lacks foundation (FRE 602), lacks personal knowledge (FRE 601-606); lacks authentication (FRE 901); hearsay (FRE 802); and calls for speculation and conclusory (FRE 901-902, 1000-1004). There is no authentication for Ex. AA attached to and referenced in Plaintiffs' Exhibits in support of Opposition to MSJ, response to SSUMF iso County Defendants' MSJ and in Opposition to County Defendants' MSJ (Doc. 238, 238-2, Doc. 238:16 Exhibit AA). Plaintiffs do not not [sic] establish lay a foundation for the report or contents therein. Also, calls for speculation and conclusory (FRE 901-902, 1000-1004); and improper opinion and impermissible expert opinion (FRE 701-702); contains legal argument. This is not proper matter for summary judgment evidence and is hearsay, irrelevant.

Def. Evid. Obj. at 3.

Again, the Court declines to devote a full analysis to a laundry list of boilerplate objections. *Baker v. SeaWorld Entm't, Inc.*, 423 F. Supp. 3d 878, 927 (S.D. Cal. 2019). At any rate, the content of Dr. Metzner's report, save for the Court's *Daubert* analysis below and any rulings on whether portions of his report are subject to exclusion, will be admissible in some form at trial. Accordingly, the Court **OVERRULES** these objections.

**B.    Rule 25 Substitution**

Next, buried in County Defendants' Separate Statement, at No. 57, is the fact that Plaintiff Dean Morton passed away at some undisclosed point during the pendency of this action. CDSS No. 57. County Defendants also offer that "Mr. Morton's sister, Linnea Morton, has stepped in as plaintiff for [Dean] Morton." *Id.* In setting forth this fact, County Defendants rely on one piece of evidence: Exhibit 48. County Defendants' Exhibit 48 is an excerpt from Linnea Morton's deposition transcript. Def. Ex. 48. At the pinpoint citation, Linnea Morton responds to questions about whether her father, Dean

Morton, submitted a tort claim to the County.  Def. Ex. 48 at 175:20–176: 4.  This evidence does not support either the fact that Dean Morton has passed away or that Linnea Morton has "stepped in" for him as a party to this litigation.  CDSS No. 57. Nevertheless, Plaintiffs do not dispute this fact.  *Id.*

An individual cannot simply "step[] in" for another after death.  CDSS No. 57. The Federal Rules of Civil Procedure prescribe a process for substitution after the death of a named party.  Rule 25 provides:

> If a party dies and the claim is not extinguished, the court may order substitution of the proper party. A motion for substitution may be made by any party or by the decedent's successor or representative. If the motion is not made within 90 days after service of a statement noting the death, the action by or against the decedent must be dismissed.

Fed. R. Civ. P. 25(a)(1).

Here, Plaintiffs did not file a motion for substitution.  In fact, it appears they never filed and served a statement noting death in accordance with Rule 25(a)(3), and so never informed the Court of Dean Morton's death.  And the Court has not ordered that anyone be substituted in his stead.

Even assuming the Court construes County Defendants' unopposed statement of fact as an implicit request for substitution pursuant to Rule 25 by Plaintiffs, substitution is not supported on this record.  Courts analyzing Rule 25(a) motions consider whether "(1) the motion is timely, (2) the claims pled are extinguished, and (3) the person being substituted in a proper party."  *Maseda v. Saul*, No. 1:20-cv-01657 JLT, 2021 U.S. Dist. LEXIS 104746, at *2 (E.D. Cal. June 2, 2021); *Gonzalez v. Specialized Loan Servicing, LLC*, No. 2:23-cv-04119-MCS-RAO, 2024 U.S. Dist. LEXIS 76300, at *2 (C.D. Cal. Feb. 27, 2024).  Here, any implicit request for substitution may not be untimely because no notice of death has ever been filed.  But it is nevertheless woefully belated.  There is cause to believe that Dean Morton has been deceased since sometime in 2022.  Dean Morton has not personally signed any filing nor has he otherwise personally participated

in this case since 2021.[6]  To that end, his February 2021 declaration that was submitted in support of Plaintiffs' Second Amended Complaint, *see* Doc. No. 20 at 43, was no longer attached to their pleading when they filed their Third Amended Complaint in June 2022, *see* Doc. No. 28, and Fourth Amended Complaint, which they first proposed in September 2023, *see* Doc. No. 143-1 at 23–83.  And Linnea Morton, who is neither a party to this action nor a relevant fact witness to the events at issue, was nevertheless deposed on May 3, 2023.  Def. Ex. 48.  Thus, Ms. Morton and counsel have seemingly had two years to begin the substitution process by filing a statement noting Dean Morton's death.  Moreover, it would appear that they had at least one opportunity to address Dean Morton's death by merely amending the complaint: Ms. Morton has filed at least one, and possibly two, pleadings since Dean Morton's death.  Doc. Nos. 28, 190. And yet they have never properly notified the Court or the parties of Dean Morton's death, including by way of Ms. Morton's filings connected with the present motion.  Nor have they properly sought substitution.  And now Dean Morton's claims are before the Court for summary judgment adjudication.

More importantly, however, there is no evidence or argument tending to show that Linnea Morton, Dean Morton's daughter, is Dean Morton's "successor or representative," Fed. R. Civ. P 25(a)(1), under California law as opposed to, for example, his wife, Ms. Morton.  And Plaintiffs do not explain which of Dean Morton's claims survive his death.

Consequently, the Court rejects the parties' contention that Linnea Morton has been substituted as a plaintiff in this matter and, to the extent Ms. Morton seeks substitution on this record pursuant to Rule 25, the Court **DENIES** her request.

---

[6] Curiously, Plaintiffs' counsel signed interrogatory responses on behalf of Dean Morton in September 2023, Def. Exs. 66, 67, in apparent violation of Rule 33.  Fed. R. Civ. P. 33(b)(5) ("The person who makes the answers [to interrogatories] must sign them, and the attorney who objects must sign any objections.").  According to the present record, there is no verification page for these discovery responses.

**C.    Request for Judicial Notice**

Finally, Exhibit 79 to County Defendants' motion for summary judgment is a request for judicial notice.  Def. Ex. 79.  County Defendants ask the Court to take judicial notice of all four of Plaintiffs' complaints, four of the Court's orders in this case, and Ms. Morton's tort claim filed with the County on November 6, 2020.  *Id.*

The Court has no need to take judicial notice of its own orders or other filings in this action.  *Citizens Dev. Corp. v. Cnty. of San Diego*, No. 12CV00334 GPC-KSC, 2021 U.S. Dist. LEXIS 26666, at *20–21 (S.D. Cal. Feb. 11, 2021) ("[T]he Court notes that it has no need to judicially notice the existence of its own orders or the parties' filings in this case."); *Tuan Nguyen v. Aurora Loan Servs., LLC*, No. SA-CV-11-1638-AG (ANx), 2011 U.S. Dist. LEXIS 171351, at *3 (C.D. Cal. Dec. 5, 2011) ("[T]he Court need not take judicial notice of filings on its own docket or orders it has previously issued."); *see also Nanavati v. Adecco*, 99 F. Supp. 3d 1072, 1075 (N.D. Cal. 2015).  As such the Court declines to take judicial notice of these documents.

As to Ms. Morton's tort claim, the Court finds that this document is proper for judicial notice.  Federal Rule of Evidence 201 provides that courts may "judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determine from sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b).  Here, the fact that Ms. Morton submitted a tort claim to the County is not subject to reasonable dispute and the authenticity of the copy of the claim submitted, Def. Ex. 41, is not in question.  Accordingly, the Court **GRANTS** the County Defendants' request and judicially notices the fact that Ms. Morton submitted a tort claim to the County on November 6, 2020.

### III. *DAUBERT* MOTIONS

County Defendants have filed two *Daubert* motions: they seek to exclude certain opinions offered by Plaintiffs' experts Dr. Jeffrey Metzner, Doc. No. 220, and Dr. Kaycea Campbell, Doc. No. 221.

**A.    Legal Standard**

Rule 702 of the Federal Rules of Evidence provides that expert opinion evidence is admissible if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and (
> d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  As the Ninth Circuit has explained:

> Under *Daubert* and its progeny, including *Daubert II*, a district court's inquiry into admissibility is a flexible one. *Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 969 (9th Cir. 2013). In evaluating proffered expert testimony, the trial court is "a gatekeeper, not a fact finder." *Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir. 2010) (citation and quotation marks omitted).
>
> "[T]he trial court must assure that the expert testimony 'both rests on a reliable foundation and is relevant to the task at hand.'" *Id.* at 564 (quoting *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597 (1993)). "Expert opinion testimony is relevant if the knowledge underlying it has a valid connection to the pertinent inquiry. And it is reliable if the knowledge underlying it has a reliable basis in the knowledge and experience of the relevant discipline." *Id.* at 565 (citation and internal quotation marks omitted). "Shaky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion." *Id.* at 564 (citation omitted). The judge is "supposed to screen the jury from unreliable nonsense opinions, but not exclude opinions merely because they are impeachable." *Alaska Rent-A-Car*, 738 F.3d at 969. Simply put, "[t]he district court is not tasked with deciding whether the expert is right or wrong, just whether his testimony has substance such that it would be helpful to a jury." *Id.* at 969-70.

*City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1043–44 (9th Cir. 2014).

Determining admissibility under Rule 702 is within the discretion of the district court, *Kumho Tire Co., Ltd. V. Carmichael*, 526 U.S. 137, 158 (1999), and the inquiry "is

a flexible one," *Daubert*, 509 U.S. at 594. "Challenges that go to the weight of the evidence are within the province of a fact finder, not a trial court judge. A district court should not make credibility determinations that are reserved for the jury." *Pomona*, 750 F.3d at 1044.

**B.     Motion to Exclude Dr. Metzner's Opinions**

In opposition to County Defendants' motion for summary judgment, Plaintiffs offer a report written by Dr. Metzner. Doc. No. 238-16 ("Metzner Report") at 1–22. Dr. Metzner is a licensed medical doctor who has been engaged in clinical and forensic psychology since 1978. *Id.* at 29–36. From 1980 to 1981, Dr. Metzner served as Chief of Psychiatry at Colorado State Penitentiary and he served as a consulting psychiatrist to the National Prison Project and the United States Department of Justice for 30 to 40 years, respectively. *Id.* at 34. He has published numerous newsletters, books, book chapters, and peer reviewed journal articles, including on the topics of mental health and psychiatry in prisons. *Id.* at 36–146. Between 1989 and 2022, he served as an expert in 178 cases. *Id.* at 47–78.

*1.     Mental Health Clinician Standard of Care Opinions*

First, County Defendants argue that the Court should exercise its gatekeeping function and exclude Dr. Metzner's MHC standard of care opinions because Dr. Metzner does not possess the necessary personal experience or qualifications. Doc. No. 220-1 at 4. Dr. Metzner opines that the care provided to Mr. Morton by various mental health and medical professionals at VDF fell below the standard of care. Metzner Report at 17–20. According to County Defendants, although Dr. Metzner is a licensed psychiatrist, he has no experience in supervising MHCs in a correctional setting and has not received formal training in the MHC standard of care. Doc. No. 220-1 at 4–5.

As an initial matter, as it relates to Plaintiffs' negligence and/or malpractice claim, *see* FAC at 37, "the Court is not convinced that correctional providers are held to a different standard of care." *Est. of Wilson v. Cnty. of San Diego*, No. 3:20-cv-00457-RBM-DEB, 2023 U.S. Dist. LEXIS 214348, at *11 (S.D. Cal. Dec. 1, 2023). And the

Court is unpersuaded, as a general matter, that Dr. Metzner lacks the necessary qualifications or experience to testify to the standard of mental healthcare in correctional facilities merely because he has not served as a supervisor or received other, particular specialized training.  In the context of medical experts, "it is a generally accepted principle that courts should not exclude expert testimony simply because 'the trial court does not deem the proposed expert to be the best qualified or because the proposed expert does not have the specialization that the court considers most appropriate.'"  *Schroeder v. Cnty. of San Bernadino*, Case No. ED CV 118-427-DMG (JCx), 2019 U.S. Dist. LEXIS 140301, at *8 (C.D. Cal. May 7, 2019) (quoting *Holbrook v. Lykes Bros. S.S. Co.*, 80 F.3d 777, 782 (3d Cir. 1996)).  "[L]ack of specialization may go to weight only as long as an expert stays within the reasonable confines of his subject area."  *Avila v. Willits Envtl. Remediation Tr.*, 633 F.3d 828, 839 (9th Cir. 2011) (quotation marks omitted).  Here, Dr. Metzner's subject area of expertise is undoubtedly correctional psychiatry and mental healthcare.

However, County Defendants' challenge to Dr. Metzner's qualifications to testify as to the MHC standard of care calls to mind a greater issue that is not fleshed out by the parties.  In a footnote in opposition to this motion, Plaintiffs contend that they are "not required to establish a professional standard of care via expert testimony" for their Fourteenth Amendment deliberate indifference claim.  Doc. No. 235 at 8 fn.1.  They are, however, required to do so in order to prove their professional negligence claim.

The relevancy of Dr. Metzner's standard of care opinions is dependent on the underlying claims.  Thus, as Plaintiffs seem to acknowledge, Dr. Metzner's standard of care opinion is only relevant to their fifth claim, for professional negligence.  *Id.* Although the admissibility of expert testimony is governed by the Federal Rules of Evidence, the evidence necessary to prove causation in a medical malpractice action is controlled by state law.  Under California law, expert testimony or evidence is required to demonstrate the applicable standard of care.  *See, e.g.*, *Johnson v. Super. Ct.*, 49 Cal. Rptr. 3d 52, 58 (Cal. Ct. App. 2006); *see also Lattimore v. Dickey*, 191 Cal. Rptr. 3d 766,

773 (Cal. Ct. App. 2015).  Pursuant to California's competency rules as explained by the
California Court of Appeal in *Lattimore*, a nurse may testify to the standard of care for a
nurse, and a doctor may testify as to the standard of care for a doctor, but a doctor cannot
testify to the duties of a nurse and a nurse cannot testify to the duties of a doctor absent
some "certification, expertise or relevant knowledge" of the applicable standard of care.
*Lattimore*, 191 Cal. Rptr. 3d at 775 (concluding that, under California Evidence Code
§ 720, physician was not qualified to testify about standards for any hospital employees,
including nurses, other than physicians).[7]  Thus, it would appear that Dr. Metzner cannot
testify to the standard of care of any Defendant that is not a medical doctor, which would
include MHCs Alto and Sparks and Nurse Kagay.

However, as Plaintiffs explain in opposition, MHCs, psychologists, and
psychiatrists are all categorized as Qualified Mental Health Providers ("QMHP").  Doc.
No. 235 at 12.  And pursuant to the County's policies, all QMHPs are tasked with
performing ISP suicide assessments and therefore the standard for performing an ISP
suicide assessment does not deviate among the QMHPs.  *Id.* at 12–13.  This argument is,
on this record, persuasive.

In any event, this issue is not briefed.  Here, County Defendants only challenge
Dr. Metzner's standard of care opinions as to MHCs Alto and Sparks, and only on the
basis that Dr. Metzner does not have experience supervising MHCs in correctional
facilities or MHC-specific training.  The Court is not persuaded by this argument.
Dr. Metzner has some thirty (30) years of experience in correctional psychiatry as well as
extensive academic and research experience in correctional psychiatry and mental
healthcare.  Metzner Report at 40–43.  Further, it is noteworthy that Dr. Metzner has
served as a court-appointed expert in numerous cases, including that of *Coleman et al.*

---

[7] The Court also notes that at least two unreported Ninth Circuit cases have reiterated this California law
principle.  *Flores v. United States*, 780 F. App'x 420, 422 (9th Cir. 2019); *Trujillo v. Cnty. of L.A.*, 751
F. App'x 968, 972 (9th Cir. 2018).

*v. Wilson et al.*, E.D. Cal. Case No. CIV S-90-0520—the case that resulted in the appointment of a Special Master to oversee remediation of the constitutional deficiencies in California's prison mental healthcare system. *Coleman v. Schwarzenegger*, 922 F. Supp. 2d 882, 888 (E.D. Cal. 2009). In fact, according to a 2010 *Coleman* Special Master report, Dr. Metzner's work has specifically included the role of MHCs in mental health evaluations. *See Coleman v. Schwarzenegger*, No. CIV S-90-0520 LKK JFM P, 2010 U.S. Dist. LEXIS 122532 (E.D. Cal. Sep. 27, 2010).

For these reasons, and on this record, the Court is satisfied that Dr. Metzner has sufficient expertise and knowledge of the standard of care for performing ISP assessments by all QMHPs, which includes MHCs. Accordingly, to the extent County Defendants seek to exclude Dr. Metzner's standard of care opinion as to MHCs Alto and Sparks, the Court **DENIES** their motion.[8]

### 2. Opinions re MHC Alto

Next, County Defendants challenge Dr. Metzner's specific opinions that MHC Alto: (1) did not obtain records regarding Mr. Morton's recent hospitalization; (2) made the improper assumption that because he was released from the 5150 hold, there was no significant safety risk; and (3) that if MHC Alto had obtained the records from Mr. Morton's recent hospitalization, "they would have figured out he was still suicidal." Doc. No. 220-1 at 5–9.

#### a. Records from Prior Hospitalization

First, Dr. Metzner opines that "[i]t was below the standard of correctional mental healthcare to not, at least, attempt to obtain information regarding Mr. Morton from the Alvarado Parkway Institute/BHS as part of the gateway assessment process" because "obtaining such information would have demonstrated that Mr. Morton was not a reliable historian and that he omitted significant factors leading to his very serious suicide

---

[8] The Court notes that because this issue is not properly fleshed out, the Court's ruling is without prejudice to raising these issues at the motions *in limine* phase.

attempt." Metzner Report at 16–17. For the reasons discussed above, the Court is satisfied that Dr. Metzner possesses the necessary qualifications and relevant experience to testify that the standard of care for QMHPs performing an ISP assessment would include requesting prior suicide-related hospitalization records. The Court therefore **DENIES** the County Defendants' motion on this basis.

### b.    Improper Assumption

Next, County Defendants challenge Dr. Metzner's opinion that MHC Alto's assessment fell below the standard of care because she improperly assumed that following his 5150 hold release, he posed no significant safety risk. Doc. No. 220-1 at 5. Dr. Metzner's opinion in this respect is, in full:

> The May 12, 2020 ISP assessment by LMFT[9] Alto was problematic, and fell below the standard of care, for the following reasons:
>
> 1. LMFT Alto testified that Mr. Morton's discharge from the hospital "tells me that he met with clinicians, mental health providers who deemed him safe enough to clear from the hospital." While this may be true, it does not mean that their assessment was accurate as evidenced by his subsequent arrest or that conditions had not changed to the extent that he was again suicidal.

Metzner Report at 18.

According to County Defendants, MHC Alto did not rely on any assumptions in completing the ISP assessment, as confirmed by her deposition testimony. Doc. No. 220-1 at 7. But they have, perhaps inadvertently, omitted the evidence they rely on: there is no Exhibit D offered in support of this motion. *See* Doc. No. 220-2 at 103. And the cited portion of MHC Alto's deposition transcript is not included in their evidence elsewhere. *See* Def. Ex. 60.

---

[9] MHC Alto is also described as an "LMFT," which stands for "Licensed Marriage and Family Therapist," however, she is employed by the County as an MHC. Def. Ex. 75 ¶ 3.

That said, Plaintiffs offer the relevant excerpt from MHC Alto's deposition:

Q.    Is the 5150 taken separately from the PSA? Does the 5150 itself present as a possible risk of suicide?
A.    It is connected to the suicide attempt so. . .
Q.    It doesn't pose an independent risk?· I get that they kind of go together.· I'm just wondering if someone was recently 5150'd, would that -- and maybe didn't have the PSA, would that still be a risk factor?
A.    It's the same incident so I would say it's the same –
Q.    Risk factor?
A.    -- risk factor.
Q.    Okay.
A.    But the fact that he was 5150 and went to the psychiatric hospital, that tells me that he met with clinicians, mental health providers who deemed him safe enough to clear from the hospital. ·
Q.    Is the only way in which he would be released from the 5150 is if he would be deemed safe enough? ·
A.    I believe so, because if he -- if they deemed him at more imminent risk, they could continue the hold.
Q.    And how do you know that? ·
A.    From trainings.·5150 trainings and my ·experience with clients who are placed on 5150 holds and 5152 holds, they can have prolonged holds.

Doc. No. 235-3 at 195:10–195:9.

The evidence above does not demonstrate that "Defendant Alto believed API would not have discharged Mr. Morton if he was still suicidal" as Plaintiffs contend. Doc. No. 235 at 16.  Nor does it demonstrate that MHC Alto relied on any assumption regarding Mr. Morton's release from the 5150 hold during her ISP assessment.  More importantly, there appears to be no opinion offered by Dr. Metzner about any assumptions MHC Alto made during her ISP assessment.  According to Dr. Metzner's report, MHC Alto's care fell below the standard simply because she testified to the above.  Dr. Metzner clarified during his deposition:

Q.    You identified two issues you said you had with Ms. Alto, and the second one was you said her deposition testimony made the assumption that because Mr. Morton had been discharged from the hospital, he had no

significant safety issue. And you said this is a false assumption because discharge from the hospital doesn't mean you're not a danger to self. Is that your opinion?

A.    Okay. So the -- if she was saying -- and this is how I read it, and maybe I misread it. If she was saying I'm confident that he's not dangerous to himself because they wouldn't have discharged him from the hospital. If that's what she's saying, then I think that's a false assumption. If she was saying he clearly wasn't dangerous when he left the hospital, which is reassuring, and I then did an adequate -- I did a reassessment of whether things had changed, that he's still not dangerous, that would be something different. I didn't get that from her. The way I read that -- and again, maybe I'm wrong, but the way I read that is it was a protective factor that, when he got discharged from the hospital, he was fine. And I don't have to worry about him not being fine.

Q.    Okay. And so this second part of your opinion is based solely on your interpretation of Ms. Alto's deposition testimony?

A.    Correct.

Q.    Okay. And so if Ms. Alto didn't just think that he's fine because he's discharged from the Alvarado hospital and looked at other factors and did her own assessment, then your opinion would be different; correct?

MS. PENA: That misstates his testimony.

THE WITNESS: It might be different if the assessment she did was an adequate assessment. But as I said before, the fact that she didn't get information from the hospital, in my opinion, made it an inadequate assessment.

Doc. No. 220-2, Ex. A at 51:23–53:11.

Thus, Dr. Metzner's opinion in this respect is, by his own admission, only relevant if MHC Alto made an assumption regarding the 5150 hold release during her ISP assessment of Mr. Morton.  As such, to the extent Plaintiffs put forth evidence that MHC Alto made such an assumption during the ISP assessment, Dr. Metzner may testify that, in his expert opinion, relying on such an assumption contributed to the reasons her care fell below the acceptable standard.  But if Plaintiffs fail to offer evidence that MHC Alto relied on this assumption, or any assumption regarding Mr. Morton's release from the 5150 hold, during her ISP assessment, Dr. Metzner cannot, and seemingly does not, offer an opinion in this respect.  To that limited extent, the Court **GRANTS** County Defendants' motion.

c.    <u>Causation</u>

County Defendants also take issue with Dr. Metzner's opinion "that if Alto had obtained Morton's Alvarado Parkway Institute ("API") Records, it would have made a difference for Morton here because, according to Dr. Metzner, Morton's medical history as provided by him to VDF medical staff was not consistent with information in the API records." Doc. No. 220-1 at 7. Having reviewed Dr. Metzner's report, it does not appear that he comes to this conclusion or opinion. Instead, he opines that "obtaining such information would have demonstrated that Mr. Morton was not a reliable historian and that he omitted significant factors leading to his very serious suicide attempt." Metzner Report at 17. During his deposition, Dr. Metzner further stated:

> if they had gotten the records, they would have asked additional questions and not just assume that everything he was telling them was accurate, and they would have figured out that he was still suicidal, which they should have done anyways because there was information available to nursing staff and officers that wasn't conveyed. But I think had they attempted to get that additional information by asking the relevant questions, it would have become – it's likely that they would have learned that.

Doc. No. 238-15.[10]

County Defendants contend that this opinion is improper because there is no evidence that Mr. Morton was suicidal on the day MHC Alto performed the ISP assessment: May 12, 2020. Doc. No. 220-1 at 8. The Court agrees that this opinion is subject to exclusion.

Opinion testimony from a medical doctor or forensic psychologist is not necessary for a factfinder to come to the logical conclusion that if MHC Alto had received and reviewed records that differed from what Mr. Morton was reporting to her, she would have realized that "Mr. Morton was not a reliable historian" and had omitted information.

---

[10] County Defendants have, again, neglected to submit the relevant evidence with their motion or cite to the appropriate evidence elsewhere in the record. *See* Doc. No. 22-2, Ex. A.

Metzner Report at 17.  It is also within the purview of the factfinder, and not a medical doctor, to decide whether the outcome here would have been any different had MHC Alto obtained the 5150 hold records.  Plaintiffs seemingly recognize this as they note in opposition that "whether Mr. Morton was suicidal on May 12, 2020, and whether Mr. Morton should have been placed in ISP housing on May 12, 2020, is an ultimate question for the jury."  Doc. No. 235 at 18.

At bottom, according to the record before the Court at this time, Dr. Metzner seeks to offer his expert opinion that MHC Alto would have realized upon review of discrepant records that Mr. Morton was not a "reliable historian" concerning his own medical and personal history and therefore would have asked additional questions, and as a result would have realized that Mr. Morton was still suicidal.  These opinions are not scientific, technical, or otherwise reliant upon Dr. Metzner's specialized knowledge.  Fed. R. Evid. 702.  Instead, these opinions improperly invade the role of the jury.  *See In re Novatel Wireless Secs. Litig.*, No. 08cv1689 AJB (RBB), 2011 U.S. Dist. LEXIS 133105, at *13–14 (S.D. Cal. Nov. 17, 2011) (excluding expert's opinion because it "invades the authority of the trier of fact to determine for itself the plain meaning of the facts and documents" and "contains no professional standards or principles and utilizes no specialized knowledge").  Moreover, "[j]uries are likelier to credit experts, who are expected to help the jury reach the right conclusion, more than simple documentary evidence."  *Apple, Inc. v. Samsung Elecs. Co., Ltd.*, No. 12-cv-00630-LHK, 2014 U.S. Dist. LEXIS 24506 (N.D. Cal. Feb. 25, 2014).  Plaintiffs can put forth evidence of the 5150 hold records and Dr. Metzner can opine that MHC Alto's care was substandard for her failure to obtain these records.  But ultimately, it is up to the jury to determine the import of these records and opinion testimony—for example, whether MHC Alto would have or should have done anything different, including whether she would have concluded Mr. Morton was suicidal, had she obtained and reviewed these records.  Accordingly, the Court **GRANTS** County Defendants' motion in this respect and excludes these opinions.

### 3.    Opinions re MHC Sparks

Next, County Defendants challenge Dr. Metzner's opinion regarding MHC Sparks' failure to complete Mr. Morton's 24-hour ISP follow-up assessment.  According to Dr. Metzner:

> Janine Sparks, LMFT, was the mental health clinician who was scheduled to perform the 24-hour ISP follow-up assessment (see SD6474-6475) because she was responsible for conducting assessments for any inmate in Lower West 5, where Morton was housed. The reason(s) the ISP follow-up assessment was not completed were unclear but likely were related to either staffing issues, workload issues or Mr. Morton's routine quarantine status. It is clear, based on review of discovery documents, that the reason(s) did not involve Mr. Morton's scheduled follow-up appointment being "lost in the system" because Ms. Sparks list of appointments would contain a prompt re: Mr. Morton's appointment each day until the appointment was completed.

Metzner Report at 20.

Dr. Metzner's opinion as to the reasoning behind why MHC Sparks did not perform the follow-up assessment appear to be based wholly on speculation and not any reliable methodology or specialized experience.  Plaintiffs do not argue otherwise. Accordingly, to the extent Dr. Metzner seeks to offer expert opinion as to why MHC Sparks did not perform Mr. Morton's follow-up ISP assessment, the Court **GRANTS** County Defendants' motion and excludes this opinion.

County Defendants also challenge two opinions Dr. Metzner offered during his deposition as beyond the scope of his report.[11]  First, Dr. Metzner opines that:

> the nature of [Mr. Morton's] phone conversations with girlfriend and mother, in my opinion, were much more suicidal related to the conditions to confinement. So I think that had a 24-hour assessment been done, the evaluator would have seen much more distress than he was -- he was

---

[11] County Defendants have, again, failed to submit the relevant evidence in support of their motion.

-24-                    21-cv-1428-MMA-DDL

1    demonstrating prior to discharge, and that should have led to other questions
2    relevant to a suicide risk.

3  Doc. No. 235-6, Ex. A at 61:18–25.

4        The Court agrees that this opinion appears to be beyond the scope of Dr. Metzner's
5  expert report.  However, the Court is not persuaded that it should be excluded on this
6  basis alone.

7        Rule 26(a)(2)(B) requires that each expert set forth a complete statement of all of
8  their opinions in a written report, and the failure to comply with this rule results in an
9  automatic exclusion of the noncompliant evidence under Rule 37(c)(1).  However, there
10  are exceptions to this rule, such as if the failure to comply was substantially justified or
11  harmless.  Fed. R. Civ. P. 37(c)(1).  Here, County Defendants do not explain how they
12  have been prejudiced by Dr. Metzer's failure to include this opinion in his written report.
13  In any event, the record is clear that his failure to do so was harmless because County
14  Defendants had sufficient time and ability to question Dr. Metzner on this opinion when
15  he raised it during his deposition.  Accordingly, the Court **DENIES** County Defendants'
16  motion in this respect.

17        County Defendants also challenge an opinion Dr. Metzner makes on page 67 of his
18  deposition.  Doc. No. 220-1 at 10.  The record is devoid of page 67 of Dr. Metzner's
19  deposition transcript.  Without the benefit of the evidence County Defendants seek to
20  exclude, the Court cannot determine whether it is subject to exclusion.  Accordingly, the
21  Court **DENIES** County Defendants' motion on this basis.

22        *4.   Policies & Training*
23        Next, County Defendants ask the Court to exclude Dr. Metzner's opinions on the
24  sufficiency of the County's suicide prevention policies and training.  On this issue,
25  Dr. Metzner opines as follows:

26
27    1.  The policies do not provide guidance re: how to weigh the various risk and
28        protective factors in the context of determining suicide risk.

2. The policies provide very little guidance in distinguishing high vs. low vs. no risk for suicide.
3. The policies do not include a template for a suicide risk assessment or a template for a ISP follow-up assessment.

Metzner Report at 21.

Dr. Metzner further opined during his deposition that as a result of these failures, the ISP "assessments were not very standardized and really varied depending on who the clinician was doing it." Doc. No. 220-2 at 77:23–24. And according to Dr. Metzner:

> if they had a standardized suicide risk assessment, they would have more than likely done an adequate suicide risk assessment. And I think if they had done an adequate suicide risk assessment, [Mr. Morton] would not have been considered a low risk and he probably would have remained in EOH and gotten different interventions than he did.

*Id.* at 93:13–20.

County Defendants challenge this evidence as unreliable on the grounds that he did not support his opinion with any reports, studies, or tests. Doc. No. 22-1 at 11. The Court is not persuaded. As discussed above, Dr. Metzner has ample experience in correctional mental healthcare including suicide prevention programs, policies, and training in the correctional setting. And here, Dr. Metzner identifies the policies he reviewed prior to coming to this conclusion. Metzner Report at 21. Thus, he adequately explains the basis for his opinion, and the Court is satisfied that his opinion is sufficiently reliable. Consequently, the Court **DENIES** County Defendants' motion in this respect.

5. *Opinions re Nurse Macanlalay*

County Defendants also seek to exclude Dr. Metzner's opinions about Nurse Macanlalay as irrelevant because she has since been dismissed from this lawsuit. Doc. No. 220-1 at 12. According to Dr. Metzner, "[t]he decision by Samantha Macanlalay RN on 5/11/2020 that a release of information for outside healthcare records was not indicated was problematic in the context of a very recent psychiatric hospitalization

following a serious suicide attempt. Obtaining such information would have assisted in the suicide risk assessment process."  Metzner Report at 17.

The Court agrees with County Defendants that Dr. Metzner's opinion that Nurse Macanlalay's assessment was "problematic" is not probative of any fact or issue in this case.  In opposition, Plaintiffs contend that this opinion is relevant because:

> Macanlalay's conduct provides evidentiary support for Plaintiffs' municipal claims for knowingly maintaining inadequate suicide prevention policies and training. Regardless of whether she is a named defendant, Macanlalay's failure to properly document the suicidal statement Mr. Morton made to the arresting officer and her failure to obtain medical records regarding Mr. Morton's extremely recent involuntary hospitalization, provides, in part, an evidentiary basis for Dr. Metzner's inadequate policy and training opinions.

Doc. No. 235 at 29.

However, Plaintiffs do not explain how Dr. Metzner's opinion that Nurse Macanlalay's failure to obtain the 5150 hold records was "problematic" supports their *Monell* claim.  The fact that Nurse Macanlalay did not request these records may support the claim, but Dr. Metzner's opinion that her failure to do so was "problematic" does not. Moreover, contrary to Plaintiffs' position, Dr. Metzner does not indicate that he based his policies and training opinion on his earlier opinion that Nurse Macanlalay's failure to obtain the records was problematic.  For these reasons, the Court **GRANTS** County Defendants' motion and excludes Dr. Metzner's opinion in this respect.

### 6.    *Summary of Records*

Finally, County Defendants challenge Dr. Metzner's summary of the record in his report.  According to County Defendants, this evidence is impermissible because Dr. Metzner has no personal knowledge of this evidence, that his summary paraphrases the evidence and is incomplete, and that a jury has no need for expert opinion in this regard.  Doc. No. 220-1 at 13–17.  Plaintiffs disagree, arguing that Dr. Metzner properly remarked on critical evidence and offers opinions.  Doc. No. 235 at 30.

To the extent Dr. Metzner's report includes an unadorned regurgitation of the facts, evidence, and/or record in this case, his opinion and testimony is impermissible. *See Siqueiros v. GM LLC*, No. 16-cv-07244-EMC, 2022 U.S. Dist. LEXIS 3651, at *39 (N.D. Cal. Jan. 7, 2022) (excluding expert opinions and testimony "to the extent that they consist of unadorned restatements or summaries of evidence already in the record"); *Estate of Cruz-Sanchez v. United States*, No. 17-cv-569-AJB-NLS, 2019 U.S. Dist. LEXIS 161276, at *7 (S.D. Cal. Sep. 17, 2019) (distinguishing *Johns* and finding that expert's opinion was not an improper factual narrative because he "is not simply rehashing otherwise admissible evidence"); *Johns v. Bayer Corp.*, No. 09cv1935 AJB (DHB), 2013 U.S. Dist. LEXIS 51823, at *97 (S.D. Cal. Apr. 10, 2013) (excluding expert opinion in part because his "report offers nothing more than a factual narrative of these documents"). To that extent, the Court **GRANTS** County Defendants' motion.

County Defendants also specifically challenge Dr. Metzner's summary of the Citizens' Law Enforcement Review Board ("CLERB") report, State Auditor's report, Critical Incident Review Board ("CIRB") reports, and Disability Rights California ("DRC") report. Doc. No. 220-1 at 15–17. Plaintiffs did not respond to these arguments.

As to the CLERB report summary, Metzner Report at 12–13, the Court agrees that Dr. Metzner's evidence is subject to exclusion. Dr. Metzner quotes a portion of the report and comments that a statement contained therein is inaccurate based upon evidence elsewhere in the record. This opinion does not appear to be based on any expertise or particular experience, and a factfinder does not need any specialized knowledge to review two documents and determine whether they are inconsistent.

A review of Dr. Metzner's summary of the State Auditor's report, *id.* at 13–14, reveals no opinions or other commentary—Dr. Metzner simply summarizes the report and its findings. This is impermissible and therefore subject to exclusion.

Turning to the CIRB reports, Dr. Metzner indicated that he reviewed reports from January 2015 to August 2019 and opines on the adequacy of these reports and that there are "common themes" between the prior incidents and the issues he identifies as

connected to Mr. Morton's suicide. *Id.* at 15. The Court is satisfied that, if relevant, this opinion is reliable and based on Dr. Metzner's experience and qualifications.

Finally, as with his summary of the State Auditor's report, Dr. Metzner merely restates part of the DRC report. *Id.* at 15–16. This evidence is subject to exclusion as unreliable and improper.

For these reasons, the Court **GRANTS** County Defendants' motion as to the portion of Dr. Metzner's report that touches on the CLERB report, State Auditor's report, and DRC report.

**C.    Motion to Exclude Dr. Campbell's Opinions**

County Defendants also seek to exclude the opinions and testimony of Plaintiffs' expert Dr. Kaycea Campbell, Ph.D. Dr. Campbell is Plaintiffs' economist and damages expert. Doc. No. 221-1 at 2; Doc. No. 234 at 2; Doc. No. 221-2 at 5. However, damages are not yet at issue in this case. To that end, neither party offers any evidence from Dr. Campbell, for example, her report or deposition testimony, in connection with County Defendants' motion for summary judgment. Nevertheless, because County Defendants offer Dr. Campbell's report, Doc. No. 221-2 at 9–34 ("Campbell Report"), and because these issues are fully briefed, the Court reaches the merits of County Defendants' motion.

Dr. Campbell is an economist with a Ph.D. from Claremont Graduate University, a Master of Arts in Economics from the University of Southern California, and a Bachelor of Science in Economics from the University of the West Indies. Campbell Report at 9. Dr. Campbell is a tenured economics professor at Pierce College and is also the Department Chair for a multidisciplinary Political Science, Economics, Administration of Justice, and Chicano Studies unit. *Id.* She has worked as a professional economic researcher for about twenty (20) years during which time she has published articles on economic analyses associated with loss of income and calculated and researched issues such as the recovery of damages for lost profits, wrongful death, personal injury, and intellectual property damages. *Id.* She has served as an economics expert in thirteen (13) cases since 2014. *Id.* at 31–33. Dr. Campell offers her opinion on Plaintiffs' economic

damages based upon Mr. Morton's income projections, personal consumption, and household services as well as other costs attributed to his wrongful death. *Id.* at 9–10.

First, County Defendants assert that Dr. Campbell's report estimates the value of Mr. Morton's hypothetical future estate as the value of wrongful death damages, but that Mr. "Morton's estate, should one exist, is not a plaintiff in this litigation." Doc. No. 221-1 at 5. County Defendants further explain that Plaintiffs bring their wrongful death cause of action in their individual capacities and can only recover damages or injuries or losses they suffered. *Id.* at 5–6.

As an initial matter, the issue of Ms. Morton's standing to represent Mr. Morton's estate in this action was raised and resolved nearly two years ago. *See* Doc. No. 18 at 1 fn.1 (noting that Ms. Morton had not filed the affidavit required to establish standing as successor in interest to Mr. Morton's estate); Doc. No. 20 at 41; *see also* FAC at 44. Further, to summarize, Ms. Morton, as successor in interest to Mr. Morton's estate, brings the first two claims, for violation of Mr. Morton's Fourteenth Amendment rights against the individual defendants pursuant to 42 U.S.C. § 1983 and against the County and Liberty based upon their alleged inadequate policies and training pursuant to *Monell*. FAC at 12, 24. Plaintiffs press their third, fourth, and fifth claims as individuals for failure to summon, wrongful death, and professional negligence. *Id.* at 34, 36, 37. Thus, to suggest that Mr. Morton's estate is not a party to this litigation is inaccurate.

Moreover, County Defendants appear to misapprehend the distinction between wrongful death claims and survival claims and their related damages. Damages for a wrongful death claim are personal to those who survive the decedent whereas damages for claims that survive death are personal to the decedent. For wrongful death claims, *i.e.*, where heirs or survivors can recover their own damages based upon the death of their loved one, a plaintiff may recover both economic and noneconomic damages. Economic damages include, for example, the financial support that the decedent "would have contributed to the family during either the life expectancy that [the decedent] had before his death or the life expectancy of [the plaintiff], whichever is shorter" and "[t]he

1  reasonable value of household services that [the decedent] would have provided."

2  Judicial Council of California, Civil Jury Instruction (CACI) No. 3921.

3      A review of Dr. Campbell's report reveals that her opinions fall squarely within the

4  realm of permissible wrongful death damages evidence and that she does not improperly

5  include damages particular to Plaintiffs as individuals.  And because Plaintiffs press a

6  wrongful death claim, this evidence is relevant assuming they can prove liability.

7      Next, County Defendants assert that Dr. Campbell's opinions are unreliable.  The

8  Court disagrees.  Dr. Campbell calculated Mr. Morton's earning potential based upon

9  various factors and variables.

| Summary of Economic Losses by Education($): Joseph Morton, Single | | | |
|---|---|---|---|
| | Lost Income | Household Services | Personal Consumption | Total Economic Damages |
| Some College (No Degree) | 820,959.75 | 221,848.69 | (383,197.73) | $ 659,610.71 |
| Bachelors | 1,219,441.56 | 221,848.69 | (501,068.67) | $ 940,221.58 |
| Masters | 1,404,983.67 | 221,848.69 | (544,646.83) | $ 1,082,185.53 |

The estimation of the wage growth is based entirely on the cross-tabulation of earnings by age group from the conforming age-earnings regression results in the figures below.  The lost wages calculated over Joseph's work-life (ending at age 60) if he was single with no children are $659,610.71, $940,221.58, and $1,082,185.53 for the educational attainment of some college with no degree, a bachelor's degree, and a masters degree respectively.

| Summary of Economic Losses by Education($): Joseph Morton, Married w/ one Child | | | |
|---|---|---|---|
| | Lost Income | Household Services | Personal Consumption | Total Economic Damages |
| Some College (No Degree) | 820,959.75 | 351,227.19 | (157,266.04) | $ 1,014,920.90 |
| Bachelors | 1,219,441.56 | 351,227.19 | (172,655.52) | $ 1,398,013.23 |
| Masters | 1,404,983.67 | 351,227.19 | (180,573.71) | $ 1,575,637.15 |

Similarly, estimates of Joseph being married with one child are $1,014,920.90, $1,398,013.23, and $1,575,637.15 across the same educational attainment.  Note that future income has been discounted as summarized to the right.  Personal consumption estimates reduced these earnings, and calculations did not include employer-paid benefits.

24  Campbell Report at 15.

25      She also considered his past history of work.  *Id.* at 16–17.  And she sufficiently

26  explains and supports the basis for her calculations.  Her ultimate conclusion is that,

27  based upon these variables, Plaintiffs' damages range from $495,702.17 to $1,082,185.53

28  if Mr. Morton was single with no children, which he was at the time of his death.  *Id.* at

10.  The Court is satisfied that Dr. Campbell's opinion is based upon a reliable methodology and that County Defendants challenges goes to the weight of Dr. Campbell's evidence, which they can attack on cross-examination.  *See Pomona*, 750 F.3d at 1044..

For all of these reasons, the Court **DENIES** County Defendants' motion to exclude the expert opinions and testimony of Dr. Campbell.

### IV.  SUMMARY JUDGMENT LEGAL STANDARD

"A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought.  The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The party seeking summary judgment bears the initial burden of establishing the basis of its motion and of identifying the portions of the declarations, pleadings, and discovery that demonstrate absence of a genuine issue of material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The moving party has "the burden of showing the absence of a genuine issue as to any material fact, and for these purposes the material it lodged must be viewed in the light most favorable to the opposing party."  *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157 (1970).  A fact is material if it could affect the "outcome of the suit" under applicable law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute about a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party.  *See id.*

If the moving party meets its burden, the nonmoving party must go beyond the pleadings and, by its own evidence or by citing appropriate materials in the record, show by sufficient evidence that there is a genuine dispute for trial.  *See Celotex*, 477 U.S. at 324.  The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . ."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  A "scintilla of evidence" in support of the nonmoving party's position is insufficient; rather, "there must be evidence on which the

jury could reasonably find for the [nonmoving party]." *Anderson*, 477 U.S. at 252. Moreover, "a party cannot manufacture a genuine issue of material fact merely by making assertions in its legal memoranda." *S.A. Empresa de Viacao Aerea Rio Grandense v. Walter Kidde & Co., Inc.*, 690 F.2d 1235, 1238 (9th Cir. 1982).

Federal Rule of Civil Procedure 56(e) compels the non-moving party to "set out specific facts showing a genuine issue for trial" and not to "rely merely on allegations or denials in its own pleading." Fed. R. Civ. P. 56(e); *Matsushita Elec. Indus. Co., Ltd*, 475 U.S. at 586–87. Rule 56(c) mandates the entry of summary judgment against a party who, after adequate time for discovery, fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which the party will bear the burden of proof at trial. *See Celotex*, 477 U.S. at 322–23.

## V. DISCUSSION

County Defendants seek summary judgment on all of Plaintiffs' claims for a variety of reasons, including on qualified immunity grounds. Separately, County Defendants argue that Dean Morton failed to comply with the Tort Claims Act. The Court addresses the claims and arguments in turn.

### A. Fourteenth Amendment Individual Liability

Plaintiffs' first claim is for deliberate indifference in violation of the Fourteenth Amendment. FAC at 12. Ms. Morton brings this claim as successor in interest to Mr. Morton's estate against Dr. Rahmani, Alto, Berlin, Sparks, and Kagay. *Id.* County Defendants seek summary judgment on this claim in favor of Alto and Sparks. First, they argue that Ms. Morton fails to establish that either Alto or Sparks violated Mr. Morton's Fourteenth Amendment rights. Doc. No. 219-1 at 13–24. County Defendants also assert that Alto and Sparks are entitled to qualified immunity. *Id.*

"Individuals in state custody have a constitutional right to adequate medical treatment." *Sandoval v. Cnty. of San Diego*, 985 F.3d 657, 667 (9th Cir. 2021) (citing *Estelle v. Gamble*, 429 U.S. 97, 104–05 (1976)). For pretrial detainees, the right to adequate medical care arises under the Due Process Clause of the Fourteenth

Amendment.  *Id.* (citing *Bell v. Wolfish*, 441 U.S. 520, 535–36 (1979)).  When a pretrial detainee alleges that they received deficient medical care under the Fourteenth Amendment, courts in the Ninth Circuit apply an 'objective deliberate indifference" standard.  *Gordon v. County of Orange* (*Gordon I*), 888 F.3d 1118, 1124–25 (9th Cir. 2018).  To succeed on a Fourteenth Amendment medical care claim, a plaintiff must ultimately prove:

> (i) the defendant made an intentional decision with respect to the conditions under which the plaintiff was confined; (ii) those conditions put the plaintiff at substantial risk of suffering serious harm; (iii) the defendant did not take reasonable available measures to abate that risk, even though a reasonable official in the circumstances would have appreciated the high degree of risk involved—making the consequences of the defendant's conduct obvious; and (iv) by not taking such measures, the defendant caused the plaintiff's injuries.

*Gordon I*, 888 F.3d at 1125.

"With respect to the third element, the defendant's conduct must be objectively unreasonable, a test that will necessarily 'turn[ ] on the facts and circumstances of each particular case.'"  *Castro v. Cnty. of Los Angeles*, 833 F.3d 1060, 1071 (9th Cir. 2016) (quoting *Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2105)); *Graham v. Connor*, 490 U.S. 386, 396 (1989)).  The "'mere lack of due care by a state official' does not deprive an individual of life, liberty, or property under the Fourteenth Amendment."  *Id.* (quoting *Daniels v. Williams*, 474 U.S. 327, 330–31 (1986)).  The plaintiff must "prove more than negligence but less than subjective intent—something akin to reckless disregard."  *Id.*

### 1.    Defendant Alto

County Defendants contend that Alto was not deliberately indifferent to Mr. Morton's medical needs because her ISP assessment of Mr. Morton was not objectively unreasonable and that she followed County policy and took reasonable measures to abate Mr. Morton's suicide risk based upon the information available to her. Doc. No. 219-1 at 14–17.  County Defendants also contend that Ms. Morton cannot establish causation.  *Id.* at 17–18.

As to Alto's alleged deliberate indifference, the following facts are relevant to the Court's analysis.  On May 11, 2020, Mr. Morton was arrested and taken into custody at VDF.  *See, e.g.*, Def. Ex. 5.  At approximately 6:34 p.m., Nurse Macanlalay began an initial intake assessment of Mr. Morton.[12]  CDSS No. 4; Def. Ex. 2 at 29.  According to Macanlalay's note, the arresting officer was not aware of any current or recent suicidal ideation.  Def. Ex. 2 at 31.  However, when the arresting officer was asked if he had any additional information to assist in the care for Mr. Morton's health and safety, the officer checked the box for yes and noted "'Shot him.'"  *Id.* at 32.

Macanlalay went on to note that Mr. Morton had a "Past medical or psychiatric hospitalization[]" noting, "yesterday 72 hours hold."  *Id.* at 33.  Mr. Morton reported to Macanlalay that he suffered from major depression.  *Id.* at 34.  As to the Columbia-Suicide Severity Rating Scale, Mr. Morton reported to Macanlalay: he wished he was dead or wished he could go to sleep and not wake up; had actual thoughts of killing himself, with a prior suicide attempt "3 days ago monoxide poisoning"; had not been thinking about how he might kill himself; had no intention of acting on these thoughts; had not started to work out the details of how he would kill himself and/or did not intend

---

[12] There is a question of fact as to whether Alto's review of Mr. Morton's records included Nurse Macanlalay's screening note.  Alto testified during her deposition that prior to her evaluation of Mr. Morton, "I read Dr. Rahmani's note, which was from the first assessment. And I might have looked at the intake screening, but I don't remember."  Pl. Ex. K at 179:22–24.  Later, when Alto was asked if she was trained to look at intake screening notes, the following exchange occurred:

> Q. Are you trained to look at the intake screening? ·
> A. If I was conducting the gatekeeping assessment, yes. ·
> Q. But you weren't. · So were you trained in the position that you did do it as a second assessment? Were you trained to look at the intake assessment?
> A. Not necessarily. · I am trained to review the previous notes.
> Q. Just one note?
> A. Well, if I need more information, I could review multiple notes. · And especially the placement note. · And the previous note.

Pl. Ex. K at 253:3–15.
    Viewing the evidence in Ms. Morton's favor as the Court must at this juncture, the Court considers Macanlalay's intake screening note as well as Dr. Rahmani's Gatekeeping note.

to carry out this plan; and had "ever done anything, started to do anything, or prepared to do anything" to end his life, "'carbon monoxide poisoning' just got out of hospital yesterday for 72 hour hold." *Id.* at 35–36. As to the additional suicide risk questions, Mr. Morton reported that his aunt had passed away a week ago, and that he felt hopeless and helpless due to alcoholism. *Id.* at 36.

Shortly thereafter, at approximately 7:06 p.m., Dr. Rahmani performed an ISP Gatekeeping Assessment of Mr. Morton. Def. Ex. 4. Dr. Rahmani noted the "Reason for Assessment/Placement" was that Mr. Morton was "Actively self harming" and "Verbalized SI/HI." *Id.* at 53. Dr. Rahmani explained:



*Id.*

Dr. Rahmani recorded that Mr. Morton was experiencing feelings of hopelessness and had been treated for depression with medication. *Id.* at 55. Mr. Morton's suicidal thinking was described as passive; Dr. Rahmani noted: "[h]e is not actively suicide at the present time. He was hungry and asking for food." *Id.* Dr. Rahmani recorded that Mr. Morton's future orientation was hopeful and that Mr. Morton had "Significant Other" support—"has a family out of town. [H]is girl friend is in town and is going to help him." *Id.* at 57. Dr. Rahmani noted Mr. Morton's suicide attempt five days prior and 5150 hold. *Id.* at 59.

Ultimately, Dr. Rahmani assessed Mr. Morton's "Current Suicide Risk Acuity" as low, explaining "Pt. is not currently suicidal. Had a suicide attempt last week." *Id.* at 61. Dr. Rahmani placed Mr. Morton in "ISP – EOH" and noted that an additional provider was to assess Mr. Morton within 12 to 24 hours. *Id.* at 62. Mr. Morton was to remain in EOH "until he is cleared by a Qualified Mental Health Professional." *Id.*

In his Gatekeeper Discharge note, Dr. Rahmani further noted: "Pt. placed in EOH-Low on 5/11/2020 @ 1906, due to recent SA. Currently denies being suicidal. [D]enied any AH/VH." *Id.* at 64.

The following day, on Tuesday, May 12, 2020 at approximately 7:23 a.m., MHC Alto performed an ISP assessment of Mr. Morton after his placement in EOH.  CDSS No. 14; Def. Ex. 9.  According to Alto's notes,



Def. Ex. 9 at 75.

Under "Depressive Symptoms" Alto checked the box for "Not Able to Assess" and explained: "No sxs of depression noted. Has hopefulness about future, desiring to return to rehab for ETOH use. Stated he is struggling w/ sxs of ETOH w/drawal." *Id.* at 77. When asked, Mr. Morton denied suicidal thinking. *Id.*; CDSS No. 15.  Alto recorded that Mr. Morton's "Motivation for Treatment" was excellent and that his "Future orientation" was hopeful.  Def. Ex. 9 at 79.  Alto further recorded that Mr. Morton's support network included his significant other, namely his "Gf who he talked w/ via phone 'all night.'" *Id.* at 80.

Alto noted that Mr. Morton had no history of in-custody self-harm or suicide attempts. *Id.* However, she noted Mr. Morton's recent suicide attempt: "5 days ago via $CO_2$ in car. Was saved by police after someone made a 911 call. I/P stated he was tired of his ETOH use. 5150 at hospital, released 2 days ago." *Id.* at 81. Mr. Morton also reported that he had recently lost his aunt who died of cancer two weeks prior. *Id.* at 82.

Under "Current Suicide Risk Acuity," Alto checked the box for "Low" and explained: "Denied SI/HI. Stated he had recent SA d/t feeling overwhelmed by his ETOH use. I/P has support of gf and reported talking to her via phone. I/P has positive future planning to go to rehab post-release. Desires to resume psych meds. Calm and cooperative." *Id.* at 84. Alto checked the box under "Plan" for "Cleared from ISP to JPMU." *Id.*

Here, there is some evidence supporting Alto's position that her decision to classify Mr. Morton as a low risk for suicide was reasonable. During her assessment of Mr. Morton, he presented with no symptoms of depression, was hopeful about the future, namely, that he planned to return to rehab, and denied suicidal thoughts. Def. Ex. 9 at 77. He also reported that his prior suicide attempt was due to feeling overwhelmed with his alcohol use, which he was receiving treatment for. *Id.* at 84. Moreover, Dr. Rahmani's Gatekeeping note, which Alto reviewed prior to her assessment, similarly reflects that Mr. Morton presented as hopeful, had strong support from his girlfriend, and was "not currently suicidal." Def. Ex. 4 at 57, 62.

However, the Court finds that Ms. Morton has put forth sufficient evidence to raise a question of fact as to the reasonableness of Alto's ISP assessment conclusion that Mr. Morton was a low risk for suicide. According to the County's Inmate Suicide Prevention Practices & Inmate Safety Program ("Suicide Prevention Policy"), high suicide risk factors include:

1. High publicity case with possible evasion of arrest or SWAT/SED standoff with serious felony charges, including but not limited to: homicide, rape, or child-victim crimes.

2. Severe, life or death sentences.
3. The inmate states they are suicidal and or made suicidal statements to sworn staff.
4. Previous suicide attempts (within the past five years).
5. Staff observation of depressed/emotional turmoil.

Pl. Ex. W at 3.[13]  And "[o]ther risk factors" include:

1. History of psychiatric illness.
2. First time offender.
3. Intoxication/withdrawal.
4. Severe Aggressiveness[.]
5. Physical signs of depression (sadness, crying, withdrawal or silence, sudden loss or gain in appetite, insomnia, mood variations, lethargy, etc.).

*Id.* at 3–4.

Here, there is evidence supporting Ms. Morton's contention that Alto knew Mr. Morton presented with four of the five high suicide risk factors: he was arrested for a child-victim crime, Def. Ex. 1 (charging Mr. Morton with willful cruelty to child without injury or death);[14] he had previously reported he did not want to live and had made suicidal statements to staff, Def. Ex. 2 at 35; he had attempted suicide five days prior, Def. Ex. 9 at 75; and staff had observed depressive symptoms, Def. Ex. 4 at 55.  The record also reflects that he presented at least two of the five other risk factors: he reported he suffered from major depression, Def. Ex. 2 at 34; and he was experiencing alcohol withdrawal, Def. Ex. 9 at 77.[15]

---

[13] The Court refers to Plaintiffs' exhibits submitted in support of their summary judgment opposition, filed at Doc. Nos. 238-4–20, 247, by the identifying letter.

[14] The parties dispute whether the willful cruelty to child charge is a "child-victim crime."  According to Alto, it is not.  Def. Ex. 60 at 191:1–25.  However, according to the record, Alto does not dispute that she knew Mr. Morton was charged with this crime at the time she completed his ISP assessment, as reflected in her notes.  Def. Ex. 0 at 75.  Alto's belief that this charge was not a "child-victim crime" goes to the reasonableness of her assessment of Mr. Morton.

[15] Plaintiffs argue that Mr. Morton displayed "three or four out of five other risk factors" but does not explain which.  A review of Plaintiffs' Exhibit W reveals that Plaintiffs highlighted numbers 1, 2, and 3

1    Moreover, Alto testified during her deposition that she knew clearing Mr. Morton

2    from EOH housing would result in him being placed in quarantine housing, which meant

3    he could have been housed alone, and that isolation is a risk factor.  Pl. Ex. K at 258:24–

4    259:16, 260:2–4.

5    Thus, although Mr. Morton presented to Alto as hopeful and denied suicidal

6    ideations, Alto was also aware that in the last 12 hours he had expressed feeling suicidal

7    and presented with several other risk factors for suicide.  Therefore, based upon the

8    totality of the record, a reasonable trier of fact could find that Alto's decision to designate

9    Mr. Morton as a low risk for suicide was objectively unreasonable and placed

10   Mr. Morton at a substantial risk of serious harm.

11   County Defendants also contend that Alto was not deliberately indifferent because

12   she followed County policy.  Doc. No. 219-1 at 16.  The County, however, does not

13   elaborate on what the policy is, or how that undermines Ms. Morton's contention that

14   Alto was deliberately indifferent.  According to the record, it appears that the County's

15   policy is to release an inmate from ISP after two low suicide risk designations.  Def. Ex.

16   60 at 161:10–17; Pl. Ex. Y at 204: 5–6.  And here, in accordance with that policy,

17   Mr. Morton was released after Dr. Rahmani's and Alto's low risk designations.

18   However, Ms. Morton's challenge is to Alto's decision to classify Mr. Morton as a low

19   risk for suicide during his second assessment.  The mere fact that Mr. Morton was then

20   released from ISP pursuant to policy does not impact her claim that Alto's decision to

21   designate Mr. Morton as a low risk for suicide was objectively unreasonable.

22   As to whether Alto took measures to abate Mr. Morton's suicide risk, County

23   Defendants rely on the fact that Mr. Morton was already placed on CIWA protocol, had

24   received withdrawal mediation and was being monitored for withdrawal symptoms, and

25

26   ───────────────

27   and, as to number 5, "signs of depression."  Pl. Ex. W at 3–4.  Plaintiffs' own highlighting of the County's Suicide Prevention Policy is not evidence that Mr. Morton presented these risk factors.  And Plaintiffs fail to offer or point to evidence demonstrating that Mr. Morton was a first-time offender or presented with "*Physical* signs of depression" *Id.* at 4 (emphasis added).

28

that Alto confirmed that a psychiatric evaluation had been scheduled. Doc. No. 219-1 at 17. The record does reflect that at the time of Alto's ISP assessment, Mr. Morton was being monitored for alcohol withdrawal and was on CIWA protocol and medication, and was already scheduled for a psychiatric sick call. *See, e.g.*, Def. Exs. 8, 9 at 83–84. However, Alto did not take any of these measures, they were already in place. And in any event, the fact that these measures were in place merely bear on the objective reasonableness of Alto's decision. In light of the evidence discussed above, a reasonable jury could find that, despite the fact that these procedures were in place, it was objectively unreasonable to classify Mr. Morton as a low risk for suicide.

Next, County Defendants assert that Ms. Morton cannot establish causation. Alto performed Mr. Morton's ISP assessment on May 12, and Mr. Morton committed suicide five days later. According to County Defendants, Dr. Berlin's Gatekeeping assessment of Mr. Morton on the evening of May 12 and Mr. Morton's suicide itself are intervening causes that break the proximate causation chain. Doc. No. 219-1 at 17.

"Traditional tort law defines intervening causes that break the chain of proximate causation" in § 1983 actions. *Van Ort v. Estate of Stanewich*, 92 F.3d 831, 837 (9th Cir. 1996) (citation omitted). A defendant's conduct is not the proximate cause of an injury "if another cause intervenes and supersedes his liability for the subsequent events." *White v. Roper*, 901 F.2d 1501, 1506 (9th Cir. 1990). "However, foreseeable intervening causes . . . will not supersede the defendant's responsibility." *Conn v. City of Reno*, 591 F.3d 1081, 1101 (9th Cir. 2009), *vacated*, 563 U.S. 915 (2011), *reinstated in part and vacated in part*, 658 F.3d 897 (9th Cir. 2011) (internal quotation marks and citation omitted).

In the context of a suicide, if a decedent's suicide is "the result of a mental condition proximately caused by defendants' violation of his constitutional rights, which condition prevents him from realizing the nature of his act or controlling his conduct," the causal chain is not broken. *Soto v. City of Sacramento*, 567 F. Supp. 662, 694 (E.D. Cal. 1983). "On the other hand, if at the time of the . . . suicide [the decedent] was able

to appreciate the nature of his act and able to control his conduct, but chose freely to [commit] suicide, defendants would not be liable for the injuries sustained by virtue of the . . . suicide." *Id.* Thus, the issue of causation is resolved on the basis of the decedent's state of mind at the time of the suicide. *Id.*; *see also Walsh v. Tehachape Unified Sch. Dist.*, 827 F. Supp. 2d 1107, 1120 (E.D. Cal. 2011) ("First, the proximate cause analysis turns on whether it is reasonably foreseeable that the claimed constitutional violation would cause a mental state that could negate the [decedent's] volition. Second, whether the [decedent's] mental state was actually such that he could not appreciate the nature of his acts upon committing suicide is often a question of fact. Third, if the facts establish that the [decedent] could not appreciate the nature of his acts, the suicide does not constitute a super[s]eding, intervening event, and the defendants may be held liable for injuries sustained as a result of the suicide.").

Here, the Court finds that Ms. Morton has raised a triable issue of fact as to causation. Viewing the evidence in her favor, Alto's decision to classify Mr. Morton as a low risk for suicide resulted in him being removed from EOH pursuant to County policy, and that it was reasonably foreseeable he would be placed in quarantine housing and that this isolation would cause his mental state to deteriorate. Thus, a jury could find that Alto's decision exposed Mr. Morton to a substantial risk of harming himself, and that his suicide could have been prevented had Alto not classified Mr. Morton as a low risk for suicide. *See Lemire v. Cal. Dep't of Corr. & Rehab.*, 726 F.3d 1062, 1081 (9th Cir. 2013). Moreover, as the Ninth Circuit has explained: "Where defendant's actions are a moving force behind a series of events that ultimately lead to a foreseeable harm, defendant is not relieved of liability on account of the intervening acts." *Conn v. City of Reno*, 591 F.3d 1081, 1101 (9th Cir. 2010), *vacated on other grounds*, 563 U.S. 915 (2011) (internal quotation marks and citations omitted). A reasonable jury could find that Alto's decision to classify Mr. Morton as a low risk of suicide set in motion a chain of events leading to the foreseeable result that Mr. Morton would commit suicide. Further, the Court is not convinced that Dr. Berlin's Gatekeeping assessment is an intervening

event as a matter of law because a reasonable jury could find that Mr. Morton's suicide was a foreseeable harm and that Dr. Berlin's failure to intervene does not sever the chain of causation on these facts.

For all of these reasons, the Court **DENIES** County Defendants' motion for summary judgment in Alto's favor as to Ms. Morton's Fourteenth Amendment individual liability claim.

### 2.    *Defendant Sparks*

Next, County Defendants contend that Sparks did not violate Mr. Morton's Fourteenth Amendment rights because she did not make any intentional decision with respect to the conditions of his confinement and had not had an individual encounter with him before he committed suicide. Doc. No. 219-1 at 20–22. County Defendants also argue that Ms. Morton cannot establish the causation element for this claim. *Id.* at 22–23.

Sparks worked as an MHC at VDF from May 12 through May 16, 2020. CDSS No. 40; Pl. Ex. T at 41:6–10. During this time, Sparks "was assigned to cover MHC sick call and follow-up appointments for five (5) housing modules, complete clinic mental health appointments, perform AdSeg (Administrative Segregation) wellness checks and evaluations, and cover gatekeeping assessments as needed." Def. Ex. 76 ¶ 4. It is undisputed that Sparks never observed, evaluated, met with, or otherwise interacted with Mr. Morton while he was at VDF. CDSS No. 44. According to County Defendants, then, she did not personally participate in the asserted deprivation of Mr. Morton's rights.

Sparks could not recall whether she was specifically responsible for the ISP follow-up of Mr. Morton, but she testified that she was responsible for ISP follow-ups for detainees housed in Mr. Morton's housing module. Pl. Ex. T at 158:8–25. Thus, the evidence supports the reasonable conclusion that Sparks was responsible for performing Mr. Morton's ISP 24-hour follow-up assessment, a point County Defendants do not dispute.

Plaintiffs contend that Sparks made the intentional decision to not perform Mr. Morton's follow-up because "she did not want to risk exposure to Covid by entering

the module [Mr.] Morton was housed in." Doc. No. 238. According to a document offered by Plaintiffs, without description or identification, when reviewing Mr. Morton's death and if there "[i]s a way to improve care," an unknown person authored the following:



1
2

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

3 Pl. Ex. U at 177–78 (emphasis added).[16]

4        Next, Plaintiffs point to Sparks' deposition testimony.  It is undisputed that

5 Mr. Morton was scheduled for a QMHP appointment on May 13, 2020, and the reason

6 for the appointment was described as "ISP f/u. Had 5150 via CO2 in car 5 days prior to

7 incarceration on 5/11/20. Hx of depression and ETOH abuse."  Pl. Ex. AC at 191.  Sparks

8 testified, generally, that 24-hour appointments are deemed level one priority.  Pl. Ex. T at

9 144:19–145:17.  When asked whether, for these types of assessments, there is any

10 discretion to evaluate the patients within 24 hours, Sparks responded that "[i]f it's a 24-

11 hour follow-up, we should be following up within 24 hours," and that if a clinician is too

12 "busy," she is trained to "[c]ommunicat[e] with the other clinicians that this appointment

13 needs to be seen."  Pl. Ex. T at 149:6–19.  There is no evidence that Sparks asked another

14 clinician to perform Mr. Morton's follow-up.

15        Further, Plaintiffs argue that Sparks was not too busy to perform Mr. Morton's

16 assessment.  Doc. No. 238 at 26.  It is undisputed that during the relevant time period,

17 Sparks worked 8.5-hour shifts.  CDSS No. 40; Pl. Ex. T at 41:6–10.  On May 13, 2020,

18 Sparks performed five assessments, totalling 3 hours and 45 minutes.  Pl. Ex. AE at 195.

19 On May 14, 2020, she performed nine, totalling just shy of 6 hours.  *Id.* at 196.  On May

20 15, 2020, Sparks performed twenty-four assessments, totalling 5 hours and 55 minutes.

21 *Id.* at 197.  And on May 16, 2020, Sparks performed three assessments, totalling 2 hours

22 and 18 minutes.  *Id.* at 198.  According to the records, Sparks did not perform any of the

23 assessments during these days in a COVID-19 quarantine housing module.  Pl. Ex. AE;

24 Pl. Ex. AF at 4–5.

25
26
27
28

---

[16] This document appears to be an attachment to an email sent by Melissa Quiroz who was, according to Plaintiffs' opposition brief, Sparks' supervisor.  Doc. No. 238 at 26.  The parties offer no evidence as to the identity of Ms. Quiroz or the author of this document.  Nevertheless, it appears that the content of this exhibit can be offered in admissible form at trial.

Regarding this timing, Sparks testified that "it would take longer for [clinicians] to be able to see individuals" during this time due to the COVID-19 cleaning protocols that were in place and so clinicians would see fewer individuals during a shift.  Def. Ex. 54 at 89:6–23.  Additionally, Sparks explained that due to COVID-19 protocols, she and another QMHP would alternate seeing patients to keep exposure to a minimum.  Def. Ex. 54 at 154:7–25 ("[W]e typically couldn't see individuals at the same time because of the COVID practices. So we had to go one and then, like, I see someone and then she sees someone. And then I see someone, and then she sees someone.").

Finally, it appears undisputed that performing Mr. Morton's assessment was not discretionary but was required.  Sparks testified that based upon the County's policy, the appointment's reference to Mr. Morton's prior suicide attempt would indicate "a level one priority of a 24-hour follow-up."  Pl. Ex. T at 153:11–22.

Based upon this evidence, the Court finds there is triable issue of fact as to why Sparks did not perform Mr. Morton's ISP follow-up assessment.  Sparks testified that 24-hour ISP follow-up assessments must be completed within 24 hours, and that despite a lack of "24-hour" or "priority" designation on the sick call,[17] the note for Mr. Morton's appointment "would indicate" to her that it was nevertheless a 24-hour level one priority. Pl. Ex. T at 153:19.  It is also undisputed that Sparks did not perform Mr. Morton's ISP follow-up assessment for four days.  Viewing the evidence in Ms. Morton's favor, a reasonable jury could conclude that Sparks was required to, and had the time to, perform Mr. Morton's follow-up during those days and chose not to, and that such a decision was objectively unreasonable.

---

[17] The sick call records to not reflect that Mr. Morton's appointment was scheduled as either a 24-hour or a level one priority ISP follow-up.  To be sure, Alto recorded that Mr. Morton's ISP follow-up was to be done in 24 hours.  Def. Ex 9 at 85.  But the appointment records merely indicate that the appointment was an ISP follow-up.  Pl. Ex. AC at 191.  There is no evidence that all ISP follow-ups are to be completed within 24 hours, or that they automatically receive such a designation.  To the contrary, the ISP assessment records suggest that they can be completed anywhere from 24 hours to 12 weeks.  Def. Ex. 9 at 85.

As to causation, for the reasons discussed above, the Court similarly finds that there is a triable issue of fact.  A reasonable jury could find that Mr. Morton's suicide on May 17, 2020, was a foreseeable result of Sparks' decision to not perform his 24-hour ISP follow up during the preceding four days.  And a jury could find that Dr. Berlin's failure to intervene is not an intervening event that severs causation on these facts.

For these reasons, the Court **DENIES** County Defendant's motion for summary judgment on this basis.

### 3.   *Qualified Immunity*

County Defendants also assert that Alto and Sparks are entitled to qualified immunity.  "To determine whether an officer is entitled to qualified immunity, the Court asks, in the order it chooses, (1) whether the alleged misconduct violated a constitutional right and (2) whether the right was clearly established at the time of the alleged misconduct."  *Hernandez v. City of San Jose*, 897 F.3d 1125, 1132 (9th Cir. 2018) (quoting *Maxwell v. Cnty. of San Diego*, 708 F.3d 1075, 1082 (9th Cir. 2013)) (alterations and quotation marks omitted).  "While the constitutional violation prong concerns the reasonableness of the officer's *mistake of fact*, the clearly established prong concerns the reasonableness of the officer's *mistake of law*."  *Gordon v. Cnty. of Orange (Gordon II)*, 6 F.4th 961, 968 (9th Cir. 2021) (quoting *Torres v. City of Madera*, 648 F.3d 1119, 1127 (9th Cir. 2011)) (quotation marks omitted) (emphases in original).  If the answer to either question is no, then the officer cannot be held liable for damages.  *Id.* (citation omitted).

As explained above, there is a question of fact as to whether Alto and Sparks violated Mr. Morton's Fourteenth Amendment rights.  As such, the Court considers the whether the right was clearly established at the time of Mr. Morton's suicide.

"The 'clearly established' standard . . . requires that the legal principle clearly prohibit the officer's conduct in the particular circumstances before him."  *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018).  "The rule's contours must be so well defined that it is 'clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'"  *Id.* (quoting *Saucier v. Katz*, 533 U.S. 194, 202 (2001)).

"[T]he right must be defined with specificity," and not at "a high level of generality."

*City of Escondido, Cal. v. Emmons*, 586 U.S. 38, 42 (2019) (citations and quotation

marks omitted).  "It is not necessary . . . that the very action in question has previously

been held unlawful. . . . But in the light of pre-existing law, the unlawfulness of the

officer's conduct must be apparent." *Ziglar v. Abbasi*, 582 U.S. 120, 151 (2017)

(citations and quotation marks omitted).  "When this test is properly applied, it protects

'all but the plainly incompetent or those who knowingly violate the law.'" *Hernandez*,

897 F.3d at 1132–33 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011)).

"The plaintiff 'bears the burden of showing that the rights allegedly violated were

clearly established[]'" at the time of impermissible conduct. *Gordon II*, 6 F.4th at 969

(quoting *Shafer v. Cnty. of Santa Barbara*, 868 F.3d 1110, 1118 (9th Cir. 2017)).

However, when considering this question of law, a court draws on its "'full knowledge'

of relevant precedent rather than restricting [its] review to cases identified by the

plaintiff." *Id.* (quoting *Elder v. Holloway*, 510 U.S. 510, 516 (1994)).

### a.    Defendant Alto

As to Alto, County Defendants assert that there is no precedent "clearly setting

forth the constitutional right of an inmate to a 'high risk' suicide designation or to safety

cell assignment where a clinician's reasonable assessment indicated there was a low risk

of suicide and further, where she believed subsequent follow-up assessment would take

place."  Doc. No. 219-1 at 19.  At the time of Mr. Morton's arrest and death in 2020, the

law was clearly established that pretrial detainees had a Fourteenth Amendment right to

be free from deliberate indifference to their medical needs, including the serious risk of

suicide.  *See Clouthier v. Cnty. of Contra Costa*, 591 F.3d 1232, 1245 (9th Cir. 2010)

(finding that pretrial detainees had a clearly established right to mental health care),

*overruled on other grounds by Castro*, 833 F.3d 1060; *Wright v. Dunne*, No. 15-cv-2671,

2020 U.S. Dist. LEXIS 34582, at *24 (E.D. Cal. Feb. 27, 2020) ("The Court agrees that

there exists a clearly established right to be free from deliberate indifference to serious

mental health needs, including risk of suicide.") (citing *Clouthier*, 591 F.3d at 1245).

When viewing the asserted constitutional right with the necessary specificity, the Court agrees with County Defendants that it was not clearly established. To defeat their claim of qualified immunity, Ms. Morton must show that, given the available case law at the time, a reasonable official, knowing what Alto knew, would have understood that her actions "presented such a substantial risk of harm to [Mr. Morton] that the failure to act was unconstitutional." *Russell v. Lumitap*, 31 F.4th 729, 740 (9th Cir. 2022).

As an initial matter, Plaintiffs point to the 1988 Ninth Circuit case of *Cabrales v. Cnty. of Los Angeles*, as supporting their position that the right here was clearly established. In that case, the Ninth Circuit upheld municipal liability where a pretrial detainee committed suicide while in a "disciplinary isolation module." *Cabrales*, 864 F.2d 1454, 1457 (9th Cir. 1988), *vacated on other grounds*, 490 U.S. 1087 (1989). The decedent had previously been diagnosed by a psychiatrist in the jail as having a "schizotypal personality" and, despite denying "suicidal desires or tendencies," was placed in a "'behavior observation module' for jail inmates considered to be mentally disturbed." *Id.* While there, the decedent attempted to commit suicide, but a psychiatrist later determined the suicide attempt was merely a "gesture" to get back to the general population housing. *Id.* Two days later, the decedent was released to general population housing but, after a physical altercation, was placed in a "disciplinary isolation module." *Id.* While in this isolation module, the decedent committed suicide. *Id.* The *Cabrales* plaintiff specifically challenged the county's understaffing of the jail and whether it "deprived the decedent of adequate psychiatric care because psychiatrists had too little time to analyze and treat inmates' psychological problems." *Id.* She also alleged that the county "demonstrated deliberate indifference to the plaintiff's psychiatric needs by putting him in disciplinary isolation after his first suicide attempt was allegedly caused by isolation from the general jail population." *Id.* The Ninth Circuit affirmed a jury verdict in favor of the *Cabrales* plaintiff. *Id.* at 1467.

More recently, in 2019, the Ninth Circuit in *Horton v. City of Santa Maria*, summarized the state of the law in the inadequate medical care-suicide context.

*Clouthier* held that a mental health specialist who failed to take adequate precautions to protect a detainee from committing suicide was not entitled to qualified immunity. 591 F.3d at 1245. The specialist knew that the detainee was suicidal, that he had attempted suicide multiple times, and that another staff member had placed the detainee in a suicide smock and warned that he needed to be "constantly monitored throughout the day to ensure his safety." *Id.* at 1244. Nevertheless, the specialist removed the detainee from regular suicide monitoring and instructed officers to return his regular clothes and bedding, which he eventually used to commit suicide. *Id.* at 1245. Under these facts, we concluded that "a reasonable mental health professional could not have thought it was lawful to remove key suicide prevention measures put in place by a prior Mental Health staff member." *Id.*

In *Conn*, we denied qualified immunity at the summary judgment stage to officers who, while transporting a detainee, observed her wrap a seatbelt around her neck in an apparent attempt to choke herself and who threatened to commit suicide. 591 F.3d at 1098. The transporting officers did not take the detainee to a medical center or alert subsequent officers to the behavior; she then committed suicide. *Id.* We concluded that "[w]hen a detainee attempts or threatens suicide en route to jail, it is obvious that the transporting officers must report the incident to those who will next be responsible for her custody and safety." *Id.* at 1102.

The facts of *Clouthier* and *Conn* do not at all resemble this case. Officer Brice's interactions with Horton began with his initial arrest, during which Horton remained cooperative. Officer Brice also spoke with Horton's girlfriend, who informed him of Horton's previous violent episodes, but did not indicate any present suicidal intentions. At the jail, Officer Brice asked Horton if he was having any medical problems, to which Horton responded in the negative.

Officer Brice did know that Horton, according to his mother, had been suicidal two weeks before the incident and that his mother thought he remained a suicide risk.

Based on these facts, which are taken in the light most favorable to Horton, a reasonable officer would not have known that failing to attend to Horton immediately would be unlawful under the law at the time of the incident. Horton did not attempt suicide in the presence of Officer Brice, as the detainee did in *Conn*. 591 F.3d at 1102. Nor, as was the case in *Clouthier*, had he attempted suicide multiple times and been deemed such a risk that medical specialists placed significant suicide prevention measures in place, measures removed by the defendant. 591 F.3d at 1245. In short, whether or not Officer Brice was in fact deliberately indifferent to a substantial risk that Horton would attempt suicide in the time before he was checked, there was

no case law at the time of the incident clearly establishing that a reasonable officer should have perceived the substantial risk.

915 F.3d 592, 600–01 (9th Cir. 2019)

Here, Alto was aware that Mr. Morton had a prior suicide attempt. But Mr. Morton did not attempt suicide while in the County's custody as was the case in *Cabrales*. Further, unlike the decedent in *Clouthier*, Mr. Morton had not previously attempted suicide multiple times in custody nor had he been designated by prior mental health professionals as requiring "significant" suicide prevention measures. And unlike in *Conn*, Mr. Morton did not attempt suicide in Alto's presence. What was known to Alto at the time of her ISP assessment was, essentially, a mixed bag of indicators. Mr. Morton had a very recent prior suicide attempt and at least during his initial intake made some expressions of suicidal ideations. However, he was previously designated as a low risk of suicide by Dr. Rahmani and twice presented with no signs or symptoms of depression, was hopeful and future oriented, and explicitly denied suicidal intent. This is in addition to the explanation by Mr. Morton that his prior suicide attempt was due to his alcohol abuse, for which he was receiving treatment and withdrawal monitoring. Viewing the evidence in Plaintiffs' favor, this record could support the interpretation that Alto's decision to classify Mr. Morton as a low risk for suicide rose to the level of reckless disregard. However, the Court cannot say that it was clearly established to the reasonable official faced with these circumstances that designation of low as opposed to high risk for suicide presented such a substantial risk that the detainee would ultimately commit suicide. And, at bottom, these facts and evidence do not support the conclusion that Alto was "plainly incompetent" or "knowingly violate[d] the law." *Hernandez*, 897 F.3d at 1132–33. Accordingly, the Court finds that Alto is entitled to qualified immunity and therefore **GRANTS** County Defendants' motion on this basis.

    b.    Defendant Sparks

The same cannot be said about Sparks. County Defendants argue that "Plaintiffs cannot point to any law clearly establishing a right to receive routine mental health

1 follow-up assessments by the scheduled provider." Doc. No. 219-1 at 24. But the Court

2 finds that Mr. Morton's right to be free from an objectively unreasonable interference or

3 denial of his urgent and mandatory mental health assessment was clearly established. In

4 addition to the above, it was also clearly established in 2020 that prison officials act with

5 deliberate indifference by "intentionally denying or delaying access to medical care or

6 intentionally interfering with treatment once prescribed." *Estelle*, 429 U.S. at 104–05;

7 *Wakefield v. Thompson*, 177 F.3d 1160, 1165 (9th Cir. 1999). Even more specifically, it

8 has been established in the Ninth Circuit since at least 1992 that the failure by a prison

9 official to follow orders of a prior physician for reasons unrelated to the medical needs of

10 the prisoner amounts to deliberate indifference. *Hamilton v. Endell*, 981 F.2d 1062,

11 1066–67 (9th Cir. 1992).

12         "Qualified immunity gives government officials breathing room to make

13 reasonable but mistaken judgments," but only with respect to "open legal questions."

14 *Ashcroft*, 563 U.S. at 743. Here, MHC Alto ordered that Mr. Morton be seen by a QMHP

15 for an ISP follow-up assessment within 24 hours of his release from EOH. Def. Ex. 9 at

16 85; Def. Ex. 11. It is undisputed that Sparks was responsible for and yet failed to perform

17 this follow-up assessment for four days. Consequently, a reasonable jury could find that

18 Sparks denied or otherwise interfered with Mr. Morton's mental health treatment by

19 failing to perform his 24-hour ISP follow-up assessment for four days due to reasons

20 unrelated to Mr. Morton's medical needs, including her own desire to avoid exposure to

21 COVID-19. Viewing these facts with the appropriate lens of specificity, the Court finds

22 that it was not an "open legal question" in 2020 whether it was constitutional for her to

23 do so, *Ashcroft*, 563 U.S. at 743; in light of the preexisting law, it would have been clear

24 to a reasonable prison official in Sparks' position that her decision to delay, deny, or

25 otherwise interfere with Mr. Morton's treatment as ordered was objectively unreasonable

26 and unlawful. Accordingly, the Court finds that Sparks is not entitled to qualified

27 immunity on this record and therefore **DENIES** County Defendants' motion for summary

28 judgment on this basis.

**B.     Fourteenth Amendment Municipal Liability**

Plaintiffs' second claim is for violation of Mr. Morton's Fourteenth Amendment rights based upon the County's inadequate suicide prevention policies and training.  FAC at 24.  Ms. Morton brings this claim on behalf of Mr. Morton's estate.  *Id.*

Municipalities cannot be held vicariously liable under section 1983 for the actions of their employees.  *Monell v. N.Y. City Dept. of Soc. Servs.*, 436 U.S. 658, 691 (1978).  "Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983."  *Id.* at 694; *Ulrich v. City & Cnty. of San Francisco*, 308 F.3d 968, 984 (9th Cir. 2002) (quoting *Monell*, 436 U.S. at 694).

Pursuant to *Monell*, in order to hold a local governmental entity liable, the plaintiff must establish: "(1) that he possessed a constitutional right of which he was deprived; (2) that the municipality had a policy; (3) that this policy 'amounts to deliberate indifference' to the plaintiff's constitutional right; and (4) that the policy is the 'moving force behind the constitutional violation.'"  *Oviatt By & Through Waugh v. Pearce*, 954 F.2d 1470, 1474 (9th Cir. 1992) (citing *City of Canton v. Geraldine Harris*, 489 U.S. 378, 389–91 (1989)); *Dougherty v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011) (citing *Plumeau v. School Dist. # 40*, 130 F.3d 432, 438 (9th Cir. 1997)).  A municipal "policy" exists when "a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question."  *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986); *Fairley v. Luman*, 281 F.3d 913, 918 (9th Cir. 2002).

> There are three ways to show a policy or custom of a municipality: (1) by showing a longstanding practice or custom which constitutes the standard operating procedure of the local government entity; (2) by showing that the decision-making official was, as a matter of state law, a final policymaking authority whose edicts or acts may fairly be said to represent official policy in

1    the area of decision; or (3) by showing that an official with final policymaking
2    authority either delegated that authority to, or ratified the decision of, a
     subordinate.
3
4    *Menotti v. City of Seattle*, 409 F.3d 1113, 1147 (9th Cir. 2005) (internal quotation marks
5    omitted).
6           A single occurrence of unconstitutional action by a non-policymaking employee is
7    insufficient to establish the existence of an actionable municipal policy or custom. *See*
8    *Davis v. City of Ellensburg*, 869 F.2d 1230, 1233-34 (9th Cir. 1989). "Only if a plaintiff
9    shows that his injury resulted from a 'permanent and well settled' practice may liability
10   attach for injury resulting from a local government custom." *Thompson v. City of Los*
11   *Angeles*, 885 F.2d 1439, 1444 (9th Cir. 1989). Further, a plaintiff must demonstrate "a
12   direct causal link between a municipal policy or custom and the alleged constitutional
13   deprivation." *Canton*, 489 U.S. at 385. "Where a plaintiff claims that the municipality
14   has not directly inflicted injury, but nonetheless has caused an employee to do so,
15   rigorous standards of culpability and causation must be applied to ensure that the
16   municipality is not held liable for the actions of its employee." *Bd. of Cnty. Comm'rs of*
17   *Bryan Cnty., Okla. v. Brown*, 520 U.S. 397, 405 (1997). "Deliberate indifference is a
18   stringent standard of fault, requiring proof that a municipal actor disregarded a known or
19   obvious consequence of his action." *Connick v. Thompson*, 563 U.S. 51, 61 (2011)
20   (quoting *Brown*, 520 U.S. at 410) (internal quotation marks omitted). To be liable under
21   this demanding standard, a municipality must have been "on actual or constructive notice
22   that its omission would likely result in a constitutional violation." *Tsao v. Desert Palace,*
23   *Inc.*, 698 F.3d 1128, 1145 (9th Cir. 2012) (citing *Gibson v. Cnty. of Washoe*, 290 F.3d
24   1175, 1186 (2002)). Actual or constructive notice is ordinarily established by showing a
25   previous pattern of similar constitutional violations. *Connick*, 563 U.S. at 62.
26          First, County Defendants argue that Ms. Morton's *Monell* claim must fail to the
27   extent it is based upon her individual liability claim against Alto and Sparks. Doc.
28   No. 219-1 at 25. However, as discussed above, a reasonable jury could conclude that

Alto's and Sparks' conduct was objectively unreasonable and in violation of the Fourteenth Amendment.

County Defendants next argue that Ms. Morton cannot establish causation between the unconstitutional policies and Mr. Morton's suicide. Doc. No. 219-1 at 25. Plaintiffs do not respond to the County Defendants' causation argument. Instead, Plaintiffs argue that a jury could find that Mr. Morton's rights were violated by "collective inaction" based upon the County's inadequate policies or training. Doc. No. 238 at 30. The County, or any of the Defendants for that matter, cannot be liable for "collective inaction." *Id.* Individual liability for constitutional violations must be based upon personal participation, *see, e.g.*, *Jones v. Williams*, 297 F.3d 930, 934 (9th Cir. 2002) ("In order for a person acting under color of state law to be liable under section 1983 there must be a showing of personal participation in the alleged rights deprivation. . . ."), and municipal liability exists where, as relevant here, the municipality makes a deliberate choice to maintain constitutionally inadequate policies or fails to correct for a widespread custom that is unconstitutional, *see, e.g.*, *Castro*, 833 F.3d at 1075 ("The custom or policy must be a deliberate choice to follow a course of action made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question.") (cleaned up).

In any event, Plaintiffs contend that the County fails to adequately train or failed to maintain an adequate suicide prevention policy that directs "QMHPs how to define 'high-risk' of suicide, or how to weigh protective vs. risk factors, or how to timely follow-up with inmates known to pose a risk of suicide." Doc. No. 238 at 30. Plaintiffs have put forth expert evidence from Dr. Metzner that supports their position. Dr. Metzner opines that the County's policies relevant to its suicide prevention program:

> even when read together, inadequately cover issues relevant to suicide prevention for the following reasons:

1. The policies do not provide guidance re: how to weigh the various risk and protective factors in the context of determining suicide risk.

2. The policies provide very little guidance in distinguishing high vs. low vs. no risk for suicide.

3. The policies do not include a template for a suicide risk assessment or a template for a ISP follow-up assessment.

Metzner Report at 21.

Plaintiffs do not explain how any of these policies were the moving force behind Mr. Morton's death. Nevertheless, viewing the totality of the evidence in Ms. Morton's favor, the Court finds that a reasonable jury could conclude that the County's failure to maintain policies that provide adequate guidance as to how QMHPs are to weigh risk and protective factors in determining suicide risk was the moving force behind Mr. Morton's death. As discussed above, there is sufficient evidence for a reasonable jury to conclude that Alto's assessment of the risk and protective factors and determination that Mr. Morton was a low risk for suicide was objectively unreasonable. Based upon the evidence that the County's policies are inadequate in this respect, a reasonable jury could similarly conclude that this inadequacy was the moving force behind Mr. Morton's death. To that extent, the Court finds that there is a triable issue of fact as to Ms. Morton's *Monell* claim and therefore **DENIES** County Defendants' summary judgment motion.

However, there is no evidence or argument as to how the County's failure to provide adequate guidance for distinguishing high versus low versus no risk of suicide contributed to Mr. Morton's death. As to this asserted inadequacy, Ms. Morton's deliberate indifference claim appears to be based upon the individual Defendants' objectively unreasonable decision to classify Mr. Morton as a low risk of suicide when he was, in fact, a high risk, not that any individual Defendant could not distinguish between high, low, and no risk for suicide. Put another way, there is no evidence that if the County's policies were adequate in this respect, any individual Defendant would have classified Mr. Morton differently.

And as to the third inadequacy, there is no evidence or argument as to how a template would have changed the outcome here. To the extent a template would sufficiently guide QMHPs in evaluating suicide risk factors during follow-up assessments, this inadequacy appears to be subsumed by the first. Further, Plaintiffs maintain that Sparks entirely failed to perform Mr. Morton's 24-hour ISP follow-up assessment in violation of County policy. And there is no evidence that any individual Defendant performed an ISP follow-up assessment or explanation as to how the existence of a template for QMHPs to use during this type of evaluation would have changed the outcome here. Thus, the Court finds that Ms. Morton has not raised a triable issue of fact to the extent her *Monell* claim is premised upon these two policy inadequacies. To that extent, the Court **GRANTS** County Defendants' motion.

Finally, in opposition to County Defendants' motion, Plaintiffs contend that Ms. Morton can demonstrate that the County's training is inadequate. Doc. No. 238 at 30–31. County Defendants do not move for summary judgment on the basis that Ms. Morton's *Monell* claim, to the extent it is based upon inadequate training, fails. *See* Doc. No. 219-1 at 24–26. Nevertheless, the Court notes that in the context of an inadequate training *Monell* claim, a plaintiff must show not merely that a particular official was unsatisfactorily trained or supervised, but that there is a "widespread practice" of inadequately training officials under circumstances showing a deliberate indifference to the need for new or additional training. *Davis*, 869 F.2d at 1235; *Canton*, 489 U.S. at 391 ("[A]dequately trained officers occasionally make mistakes; the fact that they do says little about the training program or the legal basis for holding the city liable."); *Connick*, 563 U.S. at 61 ("Thus, when city policymakers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights, the city may be deemed deliberately indifferent if the policymakers choose to retain that program."). Here, Plaintiffs have put forth evidence that the County's inadequate training with respect to performing suicide assessment was widespread.

According to Melissa Quiroz,[18] County employees receive a one-day, eight-hour suicide detection and prevention course. Pl. Ex. Y at 132:20–133:3. "[E]verybody from a mental·health clinician to a psychologist, a psychiatrist, M.D.s, nurses, cooks, [and] deputies" took this training course. *Id.* at 134:8–10. The course was required for and administered to new employees when they were hired by and onboarded with the County. *Id.* at 134:24–135:8. According to Ms. Quiroz, the course teaches employees how to identify various suicide risk and protective factors, but does not explain how employees are supposed to weigh the factors. *Id.* at 148: 9–20; *id.* at 159:5–18 (testifying that before Mr. Morton's passing, there was no training aimed at weighing the risk and protective factors). Additionally, the course does not cover how to assess whether an individual is a high risk or low risk of suicide based upon the factors. *Id.* at 153:18–25.

Additionally, Dr. Metzner opines that the County's training was inadequate as it relates to the three deficiencies identified above. Metzner Report at 21. And there is evidence that the County was on notice of these deficiencies. *Id.* at 13–16.[19]

For the same reasons discussed above, and because it appears that Ms. Quiroz's testimony only supports Dr. Metzner's conclusion as to the first deficiency, the Court finds that Plaintiffs have not demonstrated that they can prove a *Monell* claim to the extent it is based upon the County's inadequate training with respect to the second and third inadequacies identified by Dr. Metzner. To that extent, the Court finds the County is entitled to summary judgment and therefore **GRANTS** the County Defendants' motion on that limited basis.

---

[18] As noted above, *supra* fn. 16, the parties do not offer any information about Ms. Quiroz by way of County Defendants' Separate Statement or evidence. Plaintiffs refer to her in their opposition brief as "Supervisor Quiroz, also the mental health director, . . . ." Doc. No. 238 at 31. Plaintiffs also explain that Ms. Quiroz was designated by the County as the person most knowledgeable regarding the County's suicide prevention policies and training. *Id.* at 30.

[19] It appears that Plaintiffs have neglected to offer the State Auditor, CIRB, and DRC reports as evidence in opposition to County Defendants' motion. Nevertheless, the totality of the record reveals the existence of this evidence, including within Dr. Metzner's report, which the Court finds can be offered in an admissible form at trial.

However, based upon this limited record, and because County Defendants do not argue otherwise, the Court finds that a reasonable jury could conclude that the County's training was inadequate and so widespread that the failure to implement new or additional training regarding the assessment of risk and protective factors in classifying an individual's suicide risk before Mr. Morton's death amounted to deliberate indifference. Thus, to the extent the County seeks summary judgment on Ms. Morton's inadequate training *Monell* claim on this basis, the Court **DENIES** the County Defendant's motion.

## C.    State Law Claims

Turning to Plaintiff's state law claims, as a threshold matter, the County Defendants argue that Dean Morton lacks standing to bring state law claims. Doc. No. 219-1 at 30–31. The California Tort Claims Act ("CTCA") provides that a plaintiff may not maintain an action for damages against a public employee unless he has presented a written claim to the state Victim Compensation and Government Claims Board within six months of accrual of the action. Cal. Gov't Code §§ 905, 911.2(a), 945.4, 950.2; *Mangold v. Cal. Pub. Utils. Comm'n*, 67 F.3d 1470, 1477 (9th Cir. 1995). Failure to demonstrate compliance with the CTCA will result in the dismissal of a party's state law tort claims. *State of Cal. v. Super. Ct. (Bodde)*, 13 Cal. Rptr. 3d 534, 543 (Cal. 2004).

Here, County Defendants concede that Ms. Morton timely filed a claim with the County, but they contend that Dean Morton did not similarly comply with the CTCA. Doc. No. 219-1 at 30–31. In support, County Defendants offer Ms. Morton's November 6, 2020 tort claim. Def. Ex. 41. Only Ms. Morton is listed as the claimant, and only she signed the form. *Id.* In opposition, Plaintiffs contends that Dean Morton substantially complied with the CTCA. According to Plaintiffs, because Ms. Morton's claim references the resulting injury as "the cost of Morton's love and contribution to his family," *Id.* at 320, the claim adequately suggests that Mr. Morton's family was submitting a tort claim on behalf of Mr. Morton and his heirs. Doc. No. 238 at 35–36.

When a plaintiff attempts to comply with claim presentation, but the compliance is defective, "the doctrine of substantial compliance may validate the claim if it 'substantially complies with all of the statutory requirements . . . even though it is technically deficient in one or more particulars.'" *Connelly v. County of Fresno*, 52 Cal. Rptr. 3d 720, 726 (Cal. Ct. App. 2006). "The doctrine of substantial compliance, however, "cannot cure total omission of an essential element from the claim or remedy a plaintiff's failure to comply meaningfully with the statute." *Id.* at 727 (internal citation and quotation marks omitted). Moreover, "substantial compliance cannot be predicated upon noncompliance." *Johnson v. City of Los Angeles*, 134 Cal. App. 2d 600, 603 (Cal. Ct. App. 1955).

Further, "a plaintiff must ordinarily file his or her own claim and may not sue to recover for his or her own injury in reliance on a claim filed by another injured party, even if the plaintiff's injury was caused by the same transaction that injured the other party." *Cal. Rest. Mgmt. Sys. v. City of San Diego*, 126 Cal. Rptr. 3d 160, 171 (Cal. Ct. App. 2011) (collecting cases). In California,

> Courts have held that when one injured party timely files a claim with a government entity and another party also injured by the same transaction seeks to pursue a suit against the government entity without filing a separate claim, the second injured party may not rely on the claim filed by the original claimant if the injury suffered by the second injured party was distinct from the injury suffered by the claimant.

*Id.* at 166–67; *Nelson v. Cnty. of L.A.*, 6 Cal. Rptr. 3d 650, 661 (Cal. Ct. App. 2003) ("Because this rule is based on the purpose of the claim statutes—which is to provide sufficient information to enable the entity to adequately investigate claims and to settlement, if appropriate, without the expense of litigation—the statutory requirements have not been met by the person who has not filed a claim, and the doctrine of substantial compliance (which applies only when there is a defect in form but the statutory requirements have otherwise been met) does not apply.") (internal citations omitted).

Assuming the doctrine of substantial compliance applies, the Court agrees that a review of the claim as a whole reveals that Ms. Morton was seeking to recover for damages incurred by Mr. Morton's family as a result of his death, and that Ms. Morton's and Dean Morton's injuries in this respect are the same. *See Connelly*, 52 Cal. Rptr. 3d at 729 (explaining that when assessing whether a party has substantially complied with CTCA, "the claim should be viewed in its entirety and a determination made as to whether the claim is susceptible to an interpretation that reasonably enables the public entity to make an adequate investigation and settle the claim"). But here, Dean Morton failed to submit a claim entirely. And the Court is not persuaded that his failure to do so is a mere technical defect. Undoubtedly, Ms. Morton and Dean Morton have their own, individual claims against the County. And yet, Dean Morton did not present a claim to the County and Ms. Morton did not state in her claim that she was filing it on his behalf. Thus, Dean Morton's failure to submit a claim would appear to amount to noncompliance, precluding application of the doctrine of substantial compliance.

That said, neither party has pointed to any relevant caselaw on this issue. County Defendants have not meaningfully responded to Plaintiffs' substantial compliance argument and have not properly briefed the issue of Dean Morton's CTCA compliance. In moving for summary judgment, County Defendants point to the undisputed fact that Dean Morton did not file his own claim with the County. Doc. No. 219-1 at 30. They then cite to the several statutory provisions of the CTCA and three cases that have no apparent applicability here. *Id.* at 30–31; *United States v. California*, 655 F.2d 914, 918 (9th Cir. 1980) (explaining that California's claim presentation statutes are designed to limit California's waiver of sovereign immunity); *Horwich v. Super. Ct.*, 87 Cal. Rptr. 2d 222, 231 (Cal. 1999) (noting the statute of limitations for wrongful death actions); *Est. of Kong v. City of San Diego*, No. 22-cv-1858-BAS-DDL, 2023 U.S. Dist. LEXIS 134641, at *29–34 (S.D. Cal. Aug. 2, 2023) (dismissing state law claims without prejudice where the plaintiff did not file a claim and the time for doing so had since expired). And in reply, they merely reiterate that Dean Morton did not submit his own claim and that the

time for doing so has expired.  Doc. No. 243 at 13–14.  Further, Plaintiffs fail to cite to any authority supporting their positions that the doctrine of substantial compliance can save a plaintiff from dismissal where he wholly failed to submit a claim or that one party's CTCA compliance can, based upon the content of the claim, be transferred to another.

Here, the issue squarely turns on whether Dean Morton's satisfaction of the CTCA's claim presentation requirement can be predicated on Ms. Morton's filing of a claim seeking damages for the loss of Mr. Morton's love and contribution to his family. Because County Defendants have not properly briefed this issue, they have not carried their burden of demonstrating that they are entitled to judgment on this basis as a matter of law.  For this reason, the Court **DENIES** their motion for summary judgment.  The Court notes that this ruling is without prejudice to renewal at the pretrial motions phase should the Court ultimately order the substitution of another into Dean Morton's place as a plaintiff in this action.

The Court now turns to each of Plaintiffs' state law claims and County Defendants' arguments as to why they are entitled to summary judgment.

### 1.  *Failure to Summon Medical Care*

Plaintiffs' third claim is for failure to summon against all Defendants.  FAC at 34. County Defendants argue that Plaintiffs' failure to summon claim fails as a matter of law. Doc. No. 219-1 at 28–30.  A failure to summon medical care claim under California Government Code § 845.6 requires a showing that: (1) "the employee is acting within the scope of his [or her] employment"; (2) "the employee knows or has reason to know that the prisoner is in need of immediate medical care"; and (3) "he [or she] fails to take reasonable action to summon such medical care."  *Villarreal v. Cty. of Monterey*, 254 F. Supp. 3d 1168, 1187 (N.D. Cal. 2017).  However, the obligation set forth in § 845.6 "does not extend to 'furnishing, monitoring, follow-up, or subsequent care for the same condition' for which care was originally summoned."  *Estate of Prasad v. Cnty. of Sutter*, 958 F. Supp. 2d 1101, 1117 (E.D. Cal. 2013) (quoting *Castaneda v. Dep't of Corr. &*

*Rehab.*, 151 Cal. Rptr. 3d 648, 666 (Cal. Ct. App. 2013)); *see also Castaneda*, 151 Cal. Rptr. 3d at 664 ("[T]he failure of [ ] public employees to provide further treatment, or to ensure further diagnosis or treatment, or to monitor [plaintiff] or follow up on his progress, are all facts which go to the reasonableness of the medical care provided, but do not constitute a failure to summon medical care."); *Lapachet v. Cal. Forensic Med. Grp., Inc.*, 313 F. Supp. 3d 1183, 1197 (E.D. Cal. 2018) ("California law is clear that inadequate medical treatment does not provide the basis for asserting a claim under § 845.6 as long as medical treatment was in fact provided.").

Here, the Court finds that, at best, Plaintiffs' failure to summon claim challenges the adequacy of the care Mr. Morton received and does not demonstrate that either Alto or Sparks failed to summon medical care as contemplated by the California Government Code. Even accepting that presenting with a risk of suicide is a medical condition requiring immediate attention, Plaintiffs do not argue or put forth evidence that his suicidal condition as it existed at the time of the events involving Alto and Sparks was not the same condition that initially triggered his placement in ISP when he entered VDF. To that end, Mr. Morton was already under observation for his suicidal condition at the time of Alto's assessment of him. Moreover, Plaintiff's challenge to Sparks' failure to perform Mr. Morton's 24-hour ISP follow-up is precisely the type of challenge to a failure to "follow up" that is not encompassed by California Government Code § 845.6. *Castaneda*, 151 Cal. Rptr. 3d at 664. And although Sparks' failure to perform Mr. Morton's 24-hour ISP follow-up might be found to be objectively unreasonable, there is no evidence that Sparks knew or should have known Mr. Morton needed *immediate* medical care during the span of the four days that she failed to complete his assessment. Plaintiffs' arguments to the contrary are unpersuasive. Simply put, the Court finds that the undisputed facts do not support a claim against Alto or Sparks for failure to summon as provided for and contemplated by California Government Code § 845.6 as a matter of law; the evidence and Plaintiffs' arguments merely go to the adequacy of medical care Mr. Morton received for his suicidal condition and are not

actionable.  And because Plaintiffs' failure to summon claim against Alto and Spark fails as a matter of law, their claim against the County fails as well.  Accordingly, the Court **GRANTS** County Defendants' motion on this basis.

### 2.    *Professional Negligence*

County Defendants similarly argue that Plaintiffs' professional negligence claim against Alto and Sparks fail as a matter of law.  Doc. No. 219-1 at 28–30.  Plaintiffs' fifth cause of action is for professional negligence.  Under California law, the elements for professional negligence, including medical malpractice, that a plaintiff must prove are:

> (1) the duty of the professional to use such skill, prudence, and diligence as other members of his profession commonly possess and exercise; (2) breach of that duty; (3) a proximate causal connection between the negligent conduct and the resulting injury; and (4) actual loss or damage resulting from the professional's negligence.

*Hanson v. Grode*, 90 Cal. Rptr. 2d 396, 400 (Cal. Ct. App. 1999) (internal quotation marks and citation omitted).  "As a general rule, the testimony of an expert witness is required in every professional negligence case to establish the applicable standard of care, whether that standard was met or breached by the defendant, and whether any negligence by the defendant caused the plaintiff's damages."  *Younan v. Rolls-Royce Corp.*, No. 09-cv-02136-WQH-BGS, 2012 U.S. Dist. LEXIS 79318, at *16–17 (S.D. Cal. June 6, 2012) (quoting *Scott v. Rayhrer*, 111 Cal. Rptr. 3d 36, 42 (Cal. Ct. App. 2010) (internal quotation marks omitted)); *see also Flowers v. Torrance Mem'l Hosp. Med. Ctr.*, 35 Cal. Rptr. 2d 685, 690 (Cal. 1994) ("[T]his court has on numerous occasions articulated the general rule applicable in negligence cases arising out of the rendering of professional services: The standard of care against which the acts of a physician are to be measured is a matter peculiarly within the knowledge of experts; it presents the basic issue in a malpractice action and can only be proved by their testimony, unless the conduct required by the particular circumstances is within the common knowledge of the layman.") (internal quotation marks and citations omitted).

Here, County Defendants do not contend that Plaintiffs fail to put forth evidence from an expert witness regarding the applicable standard of care, nor do they argue that Plaintiffs cannot prove that Alto's and Sparks' conduct fell below that standard.  Instead, County Defendants summarily argue that Alto and Sparks acted reasonably and that Alto, specifically, followed County policy.  Doc. No. 219-1 at 28.  However, as discussed above, a reasonable jury could determine that Alto's and Sparks' actions were objectively unreasonable.  And in any event, one does not avoid liability for professional negligence merely by acting reasonably, but by acting in accordance with the appropriate standard of care for his or her profession.  Moreover, County Defendants do not explain how following an unconstitutionally inadequate policy, based upon Plaintiffs' view of the evidence, undermines Plaintiffs' professional negligence claim as a matter of law.  Accordingly, to the extent County Defendants seek summary judgment on this basis, the Court **DENIES** their motion.

### 3.    *Wrongful Death*

Next, County Defendants argue that Plaintiffs' wrongful death claim against Alto and Sparks fails as a matter of law because their failure to summon and professional negligence claims fail.  Doc. No. 219-1 at 30.  The elements of a wrongful death claim are: (1) a wrongful act or neglect that (2) causes (3) the death of another person.  *See* Cal. Code Civ. P. § 377.60; *Norgart v. Upjohn Co.*, 87 Cal. Rptr. 2d 453, 458 (Cal. 1999).  As discussed above, Plaintiffs' professional negligence claim survives summary judgment and a wrongful death claim may be premised upon professional negligence.  Cal. Civ. Code § 3333.2(j)(4) (defining "Professional negligence" is defined as "a negligent act or omission to act by a health care provider in the rendering of professional services, which act or omission is the proximate cause of a personal injury or wrongful death, provided that such services are within the scope of services for which the provider is licensed and which are not within any restriction imposed by the licensing agency or licensed hospital"); *see also id.* § 3333.2(c) (prescribing the economic liability limitations for actions "for wrongful death . . . based upon professional negligence"); *Barrett v. Super.*

*Ct.*, 272 Cal. Rptr. 304, 313 (Cal. Ct. App. 1990) (holding that a wrongful death claim may be predicated on "any kind of tortious act"). Accordingly, the Court **DENIES** County Defendants' motion for summary judgment on this basis.

### 4.    Statutory Immunity

Finally, County Defendants seek summary judgment on all of Plaintiffs' state law claims on the basis that Alto and Sparks are statutorily immune from liability. California Government Code § 845.6 immunizes public entities and public employees from liability for injuries "proximately caused by the failure to furnish or obtain medical care for a prisoner in his custody." Cal. Gov. Code § 845.6. However, a narrow exception to this immunity is the one explicitly provided for in its text: as discussed above, section 845.6 creates a duty and provides liability for the failure to summon medical care.

There is no statutory exception for professional negligence or wrongful death. And although courts have permitted plaintiffs to pursue wrongful death claims in the prison medical care context, they have seemingly done so only where the claim was premised upon the failure to summon exception. Here, as discussed above, Plaintiffs cannot proceed with their failure to summon claim. As a result, Alto and Sparks are immune from liability as to the remaining state law claims. And therefore even assuming the County can be held vicariously liable based upon Alto and Sparks' professional negligence or wrongful death, Plaintiffs' claims against the County similarly fail.[20]

Consequently, the Court **GRANTS** County Defendants' motion for summary judgment as to Plaintiffs' professional negligence and wrongful death claims.

---

[20] California Government Code § 815.2 provides that public entities can be vicariously liable for the acts of their employees unless the employee is immune from liability. Cal. Gov. Code § 815.2(a). But this general vicarious liability statute is inapplicable here because, pursuant to California Government Code § 844.6, public entities may not be held liable for injuries to prisoners, Cal. Gov. Code § 844.6(a)(2), save for certain exceptions such as the failure to summon, Cal. Gov. Code § 845.6. Here, because the Court finds that Plaintiffs' failure to summon claim fails as a matter of law, and that Alto and Sparks are statutorily immune from liability for professional negligence and wrongful death, the Court finds Plaintiffs have failed to provide a legal basis to hold the County liable for any California state law claim and that the County is statutorily immune from liability.

## VI. CONCLUSION

Based on the foregoing, the Court **GRANTS IN PART** County Defendants' motion to exclude the expert opinions and testimony of Dr. Metzner and **DENIES** County Defendants' motion to exclude the expert onion and testimony of Dr. Campbell. Further, the Court **GRANTS IN PART** County Defendants' motion for summary judgment. In particular, the Court **GRANTS** summary judgment in favor of: Defendant Alto as to Ms. Morton's Fourteenth Amendment individual liability claim (Claim 1) on qualified immunity grounds; the County as to Ms. Morton's Fourteenth Amendment *Monell* claim (Claim 2) to the extent discussed above; Defendants Alto, Sparks, and the County as to Plaintiffs' failure to summon claim (Claim 3); and Defendants Alto, Sparks, and the County as to Plaintiffs' wrongful death (Claim 4) and professional negligence (Claim 5) claims based upon their statutory immunity. The Court **DENIES** the remainder of County Defendants' motion.

Further, because the Court has received informal notice of Dean Morton's death, the Court **DIRECTS** Plaintiffs' counsel to file and serve a statement noting death in compliance with Rule 25 on or before **December 20, 2024**. Counsel is further directed to file a motion for substitution, if any, no later than **90 days** after the date of that notice. The Court cautions that the failure to comply with this Order, or failure to timely file a motion for substitution, will result in dismissal of Dean Morton's claims. Fed. R. Civ. P. 25(a)(1); *Zanowick v. Baxter Healthcare Corp.*, 850 F.3d 1090, 1096 (9th Cir. 2017) (noting that Rule 25(a)(1) permits the Court, but does not require the Court, to dismiss with prejudice).

Additionally, the Court **DIRECTS** the parties to meet and confer and submit a proposed redacted version of this Order for public filing on the docket on or before **December 27, 2024**. The parties may submit their proposed redacted order by email to the undersigned's efile email address, efile_Anello@casd.uscourts.gov.

Finally, because Plaintiffs' claims must proceed to trial, the Court will issue a separate pretrial scheduling order setting all pertinent deadlines and hearings, including a

trial date, in due course.

**IT IS SO ORDERED**.

Dated:  December 16, 2024

HON. MICHAEL M. ANELLO
United States District Judge